**SCHNIP BUILDING COMPANY**

v.

**The UNITED STATES.**

No. 128–79C.

United States Court of Claims.

March 25, 1981.

Louis R. Pepe, Hartford, Conn., attorney of record, for plaintiff. Alcorn, Bakewell & Smith, Hartford, Conn., of counsel.

Glenn E. Harris, New York City, with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KASHIWA, Judge.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's request, filed June 30, 1980, for review by the court of the recommended decision of Senior Trial Judge Mastin G. White, filed April 28, 1980, pursuant to Rules 54 and 166, on plaintiff's motion and defendant's

cross-motion for summary judgment, having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

## OPINION OF THE TRIAL JUDGE

WHITE, Senior Trial Judge: The plaintiff in this case requests the court to review, under the provisions of the Wunderlich Act (41 U.S.C. §§ 321, 322 (1976)), a decision (ASBCA No. 21637) that was rendered on June 20, 1978, by the Armed Services Board of Contract Appeals ("the Board").

The case arose under a contract (No. N62472–74–C–0200) between the plaintiff and the Navy Department. Pursuant to the contract, the plaintiff was to perform, in accordance with government-furnished specifications and drawings, the excavation and the other necessary work involved in the construction of a hobby shop at the Navy's Submarine Base, Groton, Connecticut, for a fixed price of $1,551,323. The contract was awarded to the plaintiff on August 4, 1975.

One of the government-furnished specifications (which had been included in the invitation for bids on the contract) stated with respect to subsurface conditions at the building site that "hard material will be encountered as indicated from the borings" (six separate borings had been done at the building site to depths ranging from 6 feet to 7 feet 5 inches); and the specification defined "hard material" as "solid rock, firmly cemented unstratified masses or conglomerate deposits possessing the characteristics of solid rock not ordinarily removed without systematic drilling and blasting * * *."

The blasting and excavation at the building site were begun on September 29, 1975, and finished on January 2, 1976.

By means of a letter dated January 4, 1976, and addressed to the Navy's Assistant Resident Officer in Charge of Construction, the plaintiff submitted a claim for a $63,357 increase in the contract price and a 30-day extension of the 540-day period allowed for the completion of the work under the contract. In support of the claim, the plaintiff's letter asserted that the subsoil conditions at the building site differed materially from the conditions normally to be expected from the pre-bid information furnished by the Government.

The plaintiff's claim was finally denied by the contracting officer in a decision which was dated November 2, 1976, and which held that the plaintiff had "failed to conclusively establish that conditions at the site differed from those represented in the contract drawings and specifications." The plaintiff thereupon took an appeal to the Board.

After holding a hearing and receiving extensive evidence in November and December of 1977, the Board denied the plaintiff's appeal on June 20, 1978 (ASBCA No. 21637). The Board held that the plaintiff failed to give a timely notice that it allegedly had encountered unexpected subsurface conditions, and that the lack of a timely notice was prejudicial to the Government.

The present litigation was subsequently initiated by the plaintiff on April 4, 1979.

It is my opinion that the plaintiff is not entitled to recover.

### Specificity

The brief supporting the plaintiff's motion for summary judgment sets out 13 "Errors in Findings of Fact" allegedly made by the Board.

The plaintiff's brief merely identifies the challenged findings by paraphrasing them and citing the respective pages of the administrative decision on which they appear. The brief does not, with respect to any challenged finding, "state why the administrative finding is not entitled to finality," and does not "cite the portions of the record deemed to refute the administrative finding," as required by Rule 163(b)(3)(iii).

■ In reviewing the Board's decision, it is necessary, under the plain language of the Wunderlich Act, to proceed on the premise that any factual determination made by the Board must be accepted by the court as final and conclusive for the purposes of the litigation unless such determination is shown to be fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or unsupported by substantial evidence (41 U.S.C. § 321).

■ Moreover, quite apart from the specific provisions of the Wunderlich Act on this point, there is a general rule that official administrative determinations are presumed to be correct. *United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *Hirsch v. United States*, 205 Ct.Cl. 256, 260, 499 F.2d 1248, 1250 (1974).

■ The plaintiff, as the challenger of certain of the Board's factual findings, has the burden of persuading the court (through the procedure in Rule 163(b)(3)(iii)) that each challenged finding is not entitled to finality because it is fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or because it is not supported by substantial evidence. *Kaminer Construction Corp. v. United States*, 203 Ct.Cl. 182, 197, 488 F.2d 980, 988 (1973). Obviously, the plaintiff has not met this burden.

■ It is not encumbent upon the court to make an independent search of the entire record, which is quite voluminous, in order to ascertain whether the several factual findings challenged by the plaintiff do or do not meet the finality standard set out in the Wunderlich Act. The proper employment of judicial manpower precludes such an act of supererogation. The parties had the responsibility, under Rule 163(b)(3)(iii) and (c), of calling the court's attention specifically to the portions of the administrative record that are relevant to the several factual findings challenged by the plaintiff.

The plaintiff's brief, in its statement of the case and in its discussion of legal points, does include references to portions of the administrative record. Also, the Board's decision includes such references. The material thus cited by the plaintiff and the Board have been examined.

*Actual Notice*

It has been mentioned previously that the contract documents stated that "hard material"—defined as "solid rock, firmly cemented unstratified masses or conglomerate deposits possessing the characteristics of solid rock not ordinarily removed without systematic drilling and blasting"—would be encountered in performing the excavation work at the building site. This information was based upon log data derived from six separate borings to depths ranging from 6 feet to 7 feet 5 inches. The foundations for the building were to be located many feet below the maximum depth at which the borings data were taken, but it was assumed by the Government from such data that the hard material encountered in the boring process would extend downward to the level at which the building foundations were to be located.

Also, the contract documents provided that the blasting and excavation of the subsurface rock were to be done with precision; and that, after the completion of the excavation, the concrete pours which were to serve as footings for the building foundations, and some foundation walls, were to be placed against the smooth rock forming the sides and bottom of the excavated area. The rock-footing design was employed by the Government for reasons of economy, as such design was expected to save the expense of using man-made wooden forms for the pouring of the footings.

The plaintiff engaged a subcontractor (Ravizza Brothers) to perform the blasting and excavation work required by the contract. This work was commenced on September 29, 1975, and was finished on January 2, 1976.

The following numbered paragraphs constitute a brief summary of the evidence introduced by the plaintiff on the nature of the subsurface conditions encountered at the job site:

(1) In some parts of the area to be excavated, the subcontractor encountered, all the way down to the required depth of the excavation, the sort of hard material described in the contract documents.

(2) In other locations, however, there was a layer of hard cap rock, 7 or 8 feet thick (*i. e.*, down to or below the depth of the borings), but underneath the cap rock the subcontractor encountered (to the surprise of the plaintiff) a type of rock that differed materially from the subsurface conditions described in the contract documents. The type of rock underneath the cap rock was variously described by witnesses for the plaintiff as "soft rock," or as "rotten rock," or as "soft decomposed granite," or as "decomposed rock that had seams running through it," or as "a decayed type material," or as a "very seamy" type of rock material.

(3) In those locations where the seamy, comparatively soft rock was encountered, the blasting subcontractor was unable to achieve the level horizontal plane at the bottom, and the smooth sides, of the excavated area that were necessary in order for the plaintiff to pour the foundation footings against the remaining rock, as originally provided for in the contract documents.

(4) The plaintiff, having obtained from the Government (under circumstances to be discussed later) permission to do so, used wooden forms for the pouring of the foundation footings.

(5) The existence of seamy, comparatively soft rock in a substantial part of the area to be excavated made it impossible for the blasting subcontractor to control the effects of the blasts with complete accuracy. The blasts loosened material outside the pay lines prescribed in the contract; and it was necessary for the subcontractor to do a large amount of excess excavation. Whereas the contract documents required that a total of 4,200 cubic yards of rock be removed from the building site, the blasting subcontractor had already removed 6,652 cubic yards of rock as of October 15, 1975, a little more than 2 weeks after the blasting and excavation work was begun. It was necessary for the plaintiff to use fill in the areas of excess excavation.

(6) Because of the subsurface conditions that were encountered during the blasting and excavation operations, the plaintiff did not finish the foundation concrete work until the latter part of January 1976. This made it necessary for the plaintiff to do wall construction work in the winter of 1976, which was a bad one. The plaintiff would have been able to avoid this type of construction in winter weather if the subsurface conditions had not differed from those described in the contract documents.

The Board did not reach the merits of the plaintiff's claim. Instead, the Board disposed of the claim on the ground that the plaintiff failed to give a timely notice that it had encountered unexpected subsurface conditions, and that the lack of timely notice was prejudicial to the Government.

Paragraph 4 of the general provisions of the contract was the standard "differing site conditions" provision that is customarily incorporated in government construction contracts. It stated in mandatory language: that the contractor "shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing" if unexpected subsurface conditions were encountered; that the contracting officer, upon receiving such notification, should conduct a prompt investigation to determine whether the contractor had actually encountered subsurface conditions differing materially from those described in the contract documents and, if so, whether the differing conditions increased or decreased the cost of, or the time required for, the performance of the contract; and that "No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required * * *."

The evidence in the administrative record, from both the plaintiff and the Government, shows that, up until January 4, 1976, the plaintiff did not give the contracting officer, or any other Navy official, a notice in writing that unexpected subsurface conditions had allegedly been encountered in the performance of the work under the

contract. The first written notice was in the form of a letter dated January 4, 1976, and addressed to the Navy's Assistant Resident Officer in Charge of Construction. This letter asserted a claim for increases in the contract price and in the time for the completion of the work, on the ground that subsurface conditions at the building site differed materially from those described in the contract documents. The January 4, 1976, date was long after the conditions in question had been disturbed by the blasting and excavation operations. Indeed, it was after the blasting and excavation work had been completed on January 2, 1976.

The evidence is conflicting on the issue of whether, when, and in what manner the plaintiff orally notified the Government that subsurface conditions differing from those described in the contract documents had allegedly been encountered.

An example of the conflicting evidence is found in connection with the testimony of Richard Wisniewski, the plaintiff's quality control representative on the hobby shop job, about a meeting which was held on September 29, 1975 (the first day of the blasting operations) and was attended by himself, John F. Brown, the plaintiff's construction superintendent, Don Ballou, another representative of the plaintiff, Lt. George Bennett, the Navy's Assistant Resident Officer in Charge of Construction, Rance Adams, the Navy's construction representative, and William Potuchek, a Navy employee. Mr. Wisniewski said on direct examination that it was brought up at the meeting that the blasting subcontractor (Ravizza Brothers) was having problems with seams in the rock. Mr. Wisniewski also testified on direct examination that at the September 29 meeting the plaintiff requested permission to use wooden forms for the pouring of the foundation footings (in lieu of pouring the footings against smooth rock forming the sides and bottom of the excavated area). He explained that the reason for the request was that it was brought to the attention of the Navy's representatives at the meeting that the rock encountered by the blasting subcontractor was very seamy and was making it impossible for the subcontractor to obtain the smooth lines, in the rock constituting the sides and bottom of the excavated area, that were necessary in order for the foundation footings to be poured against rock.

Mr. Wisniewski's written report on the September 29, 1975, meeting did not mention the existence of a rock problem. Also, when Mr. Wisniewski was questioned by the hearing officer, he said that the plaintiff's request of September 29, 1975, for permission to use wooden forms was not occasioned by any rock problems that had been encountered in the blasting operations up until that time, but, rather, was made because the plaintiff anticipated that it would be difficult to cut out the rock for excavation in such a way that the rock remaining could be used to contain the concrete for the foundation footings, and it might be more feasible to use wooden forms.

Marlo Ravizza, who was in charge of the blasting and excavation operations under the subcontract previously mentioned, and who testified on behalf of the plaintiff at the hearing, said that he encountered a seam of dirt in the rock during the early blasting operations (which began on the day of the September 29, 1975, meeting), but that the nature of the seam did not present any real problem at that stage of the job.

With respect to the plaintiff's request at the meeting on September 29, 1975, for permission to use wooden forms in connection with the pouring of the foundation footings, William H. Potuchek, a Navy employee who was present at the September 29 meeting, testified that prior to September 29, and before any blasting was done at the job site, John F. Brown, the plaintiff's construction superintendent, brought up the matter of whether the plaintiff might be permitted to use wooden forms; and that the September 29 meeting was held to discuss the matter.

All the representatives of the Government who attended the meeting on September 29, 1975, testified at the hearing that no subsurface rock problem was brought to their attention at the meeting. Lieutenant

Bennett, the Navy's Assistant Resident Officer in Charge of Construction, indicated in his testimony that he regarded the plaintiff's request for permission to use wooden forms for the pouring of the foundation footings as having been made for the benefit of the plaintiff; and that as the proposal seemed to be practical and reasonable, he had no objection to it from the standpoint of the Government.

It should be mentioned, in connection with the meeting on September 29, 1975, that Lieutenant Bennett made some handwritten notes during the course of the meeting, and that one of these notes stated, "*Foundation* Site conditions impossible Ledge w/faults." Lieutenant Bennett testified that this notation represented his unfavorable reaction to the technique of mass-blasting that was to be employed on the ledge of rock with faults which, according to his information, constituted the subsurface at the job site. He further testified that, on the basis of previous experience, it was his opinion that rock with faults could be blasted and excavated in such a way as to leave sheer faces, if proper techniques were employed.

Mr. Wisniewski also testified about a meeting which was held on October 15, 1975, and which was attended by (among others) Rance Adams and William Potuchek, representatives of the Navy. Mr. Wisniewski said that, at this meeting, it was brought out that the blasting subcontractor was getting an excessive amount of rock, and that the rock was not coming out in sheer faces (as provided for in the contract).

The testimony of Rance Adams and William Potuchek concerning the meeting on October 15, 1975, tended to confirm the plaintiff's evidence that there was a discussion at the meeting of excessive rock which the blasting subcontractor was excavating at the building site, and concerning the possibility of the excessive rock being used at the site. On the other hand, both of these witnesses for the Government testified that no one mentioned to them, during the blasting and excavation operations, that

rock differing from that described in the contract documents was being encountered, and that they had no personal knowledge of the existence of such a situation.

On October 16, 1975, the plaintiff wrote a letter to the Construction Department at the Groton Submarine Base, and outlined the plaintiff's understanding of the matters that had been discussed and the agreements that had been reached at the meetings on September 29 and October 15, 1975. The letter indicates that the discussion at the two meetings was "prompted by rock encountered during the sitework operations"; mentions the possible use of excavated rock for backfill and for riprap; agreed "to lose excess rock and boulders in the designated spoil area"; requested a 21-day time extension for the completion of the work, as a result "of encountering additional rock"; and included the following paragraph on the use of wooden forms:

4. The Schnip Building Company requests approval to blast out an area suitable to allow forming of the foundation wall on the East-front elevation in lieu of pouring concrete in a neat cut-rock excavation as indicated. The additional rock excavation, forming operations, and backfill required would be performed at no change in the Contract price.

The letter of October 16, 1975, mentioned the problem of "additional rock," but did not assert that the rock failed to qualify as the "hard material" described in the contract documents.

The conflicting nature of the evidence on the oral notice issue is also illustrated in connection with the testimony of John F. Brown, the plaintiff's construction superintendent on the hobby shop job. He testified on direct examination that when the blasting subcontractor encountered subsurface material differing from that described in the contract documents, and the uncontrolled effects of the blasting made it necessary for the subcontractor to excavate to a depth below the elevation prescribed for the bottom of the foundation footings, he (Mr. Brown) brought "this situation" to the at-

tention of Lieutenant Bennett, the Navy's Assistant Resident Officer in Charge of Construction, and Rance Adams, the Navy's construction representative on the job; and that he requested permission to use either compacted gravel or fill concrete from the bottom of the excavation up to the elevation prescribed for the bottom of the foundation footings.

Later, however, when Mr. Brown was questioned by the hearing officer, he testified that although he advised Lieutenant Bennett and Mr. Adams that the reason for the request concerning the use of compacted gravel or fill concrete in the bottom of the excavation was that the blasts were going deeper than the plaintiff had anticipated, he did not, at any time, advise Lieutenant Bennett and Mr. Adams that this was due to a rock problem or the encountering of soft rock.

Mr. Brown testified that Lieutenant Bennett denied his request, and the plaintiff used constructive-type concrete as fill below the foundation footings.

Incidentally, it might be mentioned that, according to Mr. Brown, he never notified his superiors in the plaintiff organization until on or about December 2, 1975, that an unanticipated rock problem was being encountered at the job site. About two-thirds of the time required for the blasting and excavation work had expired as of December 2, 1975.

Both Lieutenant Bennett and Mr. Adams testified, in effect, that no one mentioned to them during the progress of the blasting and excavation operations that the subsurface rock was different from that described in the contract documents, and they were unaware of any such situation.

In general, the evidence which the plaintiff introduced at the administrative hearing with respect to the alleged giving of oral notice to government personnel concerning unexpected subsurface conditions was contradicted by testimony introduced on behalf of the Government.

In connection with the matter of notice, it perhaps should be mentioned that Rich-ard Curnow, the plaintiff's project manager on the hobby shop job, testified that at a meeting with Lieutenant Bennett on or about November 17 and 18, 1975, he told Lieutenant Bennett that there was a possibility of a proposed change order being submitted on additional rock excavation; that because of the way the rock was breaking, there would be additional costs to the plaintiff for the excavation of rock outside the pay lines fixed in the contract; that Lieutenant Bennett indicated that the proposed change order could be submitted, but he did not say whether he would approve or disapprove it; that sometime between November 19 and the end of December 1975, he met with Lieutenant Bennett again and indicated that there was a problem because the rock was not coming out the way it should and he had worked up a proposed change order on the rock that was causing the problems; and that Lieutenant Bennett said the proposed change order would be received and reviewed.

On the other hand, Lieutenant Bennett testified that Mr. Curnow never mentioned to him, during the months of November and December 1975, any problems that the plaintiff was having with subsurface conditions, and did not mention any expense and delay associated with such problems. It was not until January 1976, according to Lieutenant Bennett, that Mr. Curnow brought up the matter of subsurface conditions.

The Board accepted the version of events testified to by witnesses for the Government, and held that the plaintiff did not give the Government a timely notice (written or oral) that subsurface conditions allegedly differing from those described in the contract documents had been encountered at the job site.

The plaintiff argues in its brief that the Board's determination was against the "overwhelming weight of the evidence." The court, however, is not permitted to weigh the evidence in a Wunderlich Act case.

■ The Board's determination was based upon testimony in the administrative

record from witnesses for the Government that, until after the blasting and excavation work had been completed, the plaintiff did not give any notice, either written or oral, concerning the alleged encountering of rock that failed to qualify as hard material, and that the government personnel on the job did not know of such a situation. This testimony was "such * * * as a reasonable man might accept as adequate to support a conclusion," and, therefore, constituted substantial evidence to support the Board's determination. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). This being so, the court is precluded by the Wunderlich Act from weighing the evidence independently in order to reach its own conclusion as to whether the plaintiff did or did not give the Government timely oral notice that subsurface conditions allegedly differing from those described in the contract documents had been encountered. *Kaminer Construction Corp. v. United States, supra,* 203 Ct.Cl. at 197, 488 F.2d at 988. It is clear, as stated previously, that timely written notice was not given.

In view of the Board's factual determination concerning the lack of any timely notice, and the requirement under the Wunderlich Act that the court accept the administrative determination as final and conclusive, it would not be appropriate for the court to consider the plaintiff's legal argument that oral notice should be accepted as sufficient to fulfill the requirement of the contract's general provision 4 concerning the necessity for notice.

### Constructive Notice

■ The plaintiff contends that the Government had constructive notice that subsurface conditions differing from those described in the contract documents were being encountered during the blasting and excavation operations.

The plaintiff relies largely on evidence indicating that Rance Adams, the Navy's construction representative, visited the job site on a daily basis and regularly inspected the construction; that he was aware that

the effects of the blasting were extending beyond the limits of the pay lines and the blasting subcontractor was excavating excess rock; and that he saw the wooden forms which the plaintiff was using for the pouring of the foundation footings, in lieu of pouring the footings against smooth rock, as originally provided for in the contract documents. The plaintiff also relies on the fact that Lieutenant Bennett, the Navy's Assistant Resident Officer in Charge of Construction, was a regular visitor at the job site and visually observed the progress of the work.

The plaintiff infers from these circumstances that it should have been obvious to Rance Adams and Lieutenant Bennett that subsurface conditions differing from those described in the contract documents were being encountered.

In this connection, the plaintiff discusses at considerable length what the plaintiff regards as inconsistencies in the testimony of Rance Adams and Lieutenant Bennett.

On the other hand, both Rance Adams and Lieutenant Bennett testified not only that no one mentioned to them that subsurface conditions differing from those described in the contract documents were being encountered, but that they were personally unaware of the existence of such conditions, and that their observations at the job site did not alert them to such a situation.

Whether Rance Adams and Lieutenant Bennett reasonably should have known from the circumstances that subsurface conditions differing from those described in the contract documents were being encountered was a question of fact.

The Board considered the evidence and said that it was "unable to charge the Government with constructive knowledge under these circumstances." With respect to the knowledge of government personnel that the blasting subcontractor was excavating material outside the contract pay lines, thus necessitating the use of fill material, the Board stated in part as follows:

The appellant's [plaintiff's] extensive backfill and grade fill requirements could

have been caused either by a subsurface condition or by improper blasting techniques. The fill needs, without more, do not prove the one or the other. The burden was on the appellant to prove to the Government why such extensive fill needs existed. The Government had no obligation to ferret out the reason. * * *

The statements by Rance Adams (a Navy employee with several years' experience in construction work) and Lieutenant Bennett (a graduate architect and an experienced member of the Navy's Civil Engineer Corps) that they were personally unaware that unexpected subsurface conditions were being encountered, and that their observations at the job site did not alert them to such a situation, constituted "evidence which could convince an unprejudiced mind of the truth of the facts to which the evidence * * * [was] directed," and, therefore, amounted to substantial evidence. *Koppers Co. v. United States*, 186 Ct.Cl. 142, 149, 405 F.2d 554, 558 (1968).

■ In a Wunderlich Act case such as this, where the administrative decision on a factual issue is supported by substantial evidence, the court cannot properly weigh all the pertinent evidence, including what the plaintiff regards as inconsistencies in the testimony of Rance Adams and Lieutenant Bennett, and make an independent determination on the question of whether, under the circumstances shown by the evidence, Rance Adams and Lieutenant Bennett reasonably should have known that subsurface conditions differing from those described in the contract documents were being encountered. *T. C. Bateson Construction Co. v. United States*, 149 Ct.Cl. 514, 518 (1960).

### Prejudice

The plaintiff contends that, assuming the lack of a timely notice concerning unexpected subsurface conditions, the Government was not prejudiced by the lack of a timely notice.

To a considerable extent, the plaintiff's argument on this point is similar to contentions previously discussed, *i. e.*, that the

Navy's construction representative was at the job site every day and the Navy's Assistant Resident Officer in Charge of Construction was a frequent visitor to the job site; that the rock, as it was being excavated and thereafter, was readily visible; and that the Navy personnel on the job either knew, or reasonably should have known, that seamy, soft rock was being encountered. The plaintiff's brief states (among other things) with respect to this point that "It is simply not possible to conclude that the differing site conditions and the problems they caused could go unobserved by the Government."

The Board's determinations concerning the lack of actual and constructive notice have been discussed previously, and such discussion need not be repeated here, except to repeat that the Wunderlich Act does not permit the court to weigh the evidence and make independent determinations on these points, as the Board's findings are supported by substantial evidence and are not shown to be arbitrary, etc.

On the matter of prejudice to the Government, the Board stated in part as follows:

The appellant's [plaintiff's] failure to render the notice required by the [differing site conditions] clause and its completion of the design foundations prior to submitting its claim prevented the Government from ascertaining whether the appellant's foundation problems resulted from a subsurface condition that was unexpected or from the use of an improper blasting procedure as is suggested by the record before us. The lack of a timely notice was prejudicial to the Government because it effectively prevented any verification of appellant's claim and also the employment of alternate remedial procedures. * * *

In connection with the Board's determination, the administrative record includes the testimony of the private professional engineer who developed for the Navy the contract drawings involved in this case. He testified that if he had been informed during the course of the blasting and excava-

tion operations that problems were being encountered because of the condition of the subsurface rock, he would have gone to the job site, examined the situation, and discussed the matter with the blasting subcontractor; that he would have considered whether, despite the plaintiff's assertion that the subsurface rock was soft, it was nevertheless feasible for the rock to be blasted and excavated in such a way that the original rock-footing design for the pouring of the foundation footings could be followed; and that if he had decided it was not feasible, because of the nature of the subsurface rock, to follow the original rock-footing design, he would have then considered a redesign of the footings so as to put in either compacted fill or fill concrete from the bottom of the excavation up to the elevation prescribed for the bottom of the footings.

It has been mentioned previously that John F. Brown, the plaintiff's construction superintendent, testified that he sought permission from Lieutenant Bennett, the Navy's Assistant Resident Officer in Charge of Construction, and Rance Adams, the Navy's construction representative, to use either compacted gravel or fill concrete from the bottom of the excavation up to the elevation prescribed for the bottom of foundation footings; that he explained that the reason for the request was that the blasts were going deeper than the plaintiff had anticipated; but that he did not advise Lieutenant Bennett and Mr. Adams that this was due to a rock problem or the encountering of soft rock.

■ Here again, it must be concluded that the Board's determination concerning prejudice to the Government from the lack of a timely notice was supported by substantial evidence. This being so, the court cannot weigh all the relevant evidence and reach its own conclusion on the question of whether the Government was or was not prejudiced by the lack of a timely notice.

### Waiver

The plaintiff argues that, in view of the circumstances that the contracting officer considered and denied the plaintiff's claim on the merits, holding that the plaintiff had "failed to conclusively establish that conditions at the site differed from those represented in the contract drawings and specifications," the Board was precluded from disposing of the plaintiff's appeal on the ground that the plaintiff had failed to give the Government a timely notice concerning the alleged encountering of unexpected subsurface conditions.

It apparently is the plaintiff's theory that the contracting officer's action in considering the plaintiff's claim on the merits was somehow a waiver on the Government's behalf of any defense based upon the lack of notice.

■ Under the standard "disputes" provision which is customarily inserted in government contracts and which was included in the contract before the court, and under the related provisions of the Wunderlich Act, the contracting officer's decision of November 2, 1976, was vacated by the plaintiff's appeal to the Board. *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 954, 413 F.2d 1167, 1184 (1969). The subsequent proceedings before the Board were wholly *de novo*. *Blount Bros. Corp. v. United States*, 191 Ct.Cl. 784, 801–02, 424 F.2d 1074, 1084–85 (1970); *see Sperry Flight Systems Division of Sperry Rand Corp. v. United States*, 212 Ct.Cl. 329, 335–36, 548 F.2d 915, 919 (1977). Therefore, the previous action of the contracting officer was ineffective and not binding on the Board, or on the Government, or on the plaintiff.

The plaintiff's waiver argument is incompatible with the status—or lack thereof—of a contracting officer's decision following an appeal from such decision to a board of contract appeals. Accordingly, the argument must be rejected.

### Conclusion

For the reasons previously stated, the plaintiff's motion for summary judgment is denied, the defendant's cross-motion for summary judgment is allowed, and the petition is dismissed.