**ENGINEERED MAINTENANCE SERVICES, INC., a/k/a Engineered Maintenance Services, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 96–625C.

United States Court of Federal Claims.

March 20, 2003.

C. Paul Davis, Huntsville, Alabama, for plaintiff.

Robert D. McCallum, Assistant Attorney General; David M. Cohen, Director; Bryant G. Snee, Assistant Director; Gary J. Dernelle, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice. Lt. Col Douglas Mickle and Major Paul Salussolia, of counsel.

## OPINION

DAMICH, Chief Judge.

### I. Introduction

This case is before the Court on Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims (RCFC). Defendant contends that it was justified in terminating for default its contract with the Plaintiff, Engineered Maintenance Services, Inc. ("EMS"). According to Defendant, Plaintiff failed to give proper notice of its claim for differing site conditions and, moreover, cannot successfully assert excusable delay under the differing site condition clause. For the reasons set forth herein, Defendant's motion is hereby GRANTED.

### II. Background

On August 3, 1994, the United States Army Missile Command awarded Contract DAAHO3–94–C–0087 to EMS for $895,995.00. This firm fixed-price contract contemplated the replacement of steam and condensate lines in the 3300 Area at Redstone Arsenal, Alabama, to be completed within 315 days after receipt of a notice to proceed.

As a general rule, the Government instructed EMS to install pipe at a minimum depth of three feet. The contractor could use its discretion in choosing to install new pipe over existing pipe, so long as the new pipe met the three foot groundcover requirements. However, in response to written pre-bid questions by bidding contractors, the Government stated that in two different instances it would be appropriate to run the new system and condensate lines over the top of storm culverts with less than the required groundcover.

Although the Government did not provide any documents indicating the depth of all existing pipe, its specifications provided that the contractor could determine that depth by the depth at which the existing pipe penetrated the steam pit walls. When EMS inspected the site, it determined that the existing pipe was installed at a sufficient depth so that it believed very little of the existing pipe would need to be removed. Indeed, the Government's internal estimator estimated that only 520 linear feet of existing pipe would have to be removed. Moreover, although the contract documents indicated that all of the existing pipe contained asbestos, EMS only allocated $16,000 for asbestos removal because it believed it could install most of the pipe over existing lines. The contract drawings did not show the depth of any underground utilities, and some utilities were not shown at all.

The specifications provided that the contractor was to perform all excavation and trenching necessary to accomplish pipe removals and new pipe installation and that no steam outages would be permitted during the months of October through March. The specifications also required that the steam pits connecting the pipe be sealed and that sump pumps capable of continuously pumping water be placed in the pits to remove water.

The Government issued a notice to proceed on December 1, 1994 and ordered the contract to be completed by October 11, 1995. EMS submitted a required progress chart to the Government on January 18, 1995 which indicated that EMS would begin on-site work by February 1, 1995. On February 13, 1995, the Government notified EMS that it was concerned with its lack of progress and failure to commence work. EMS did not actually begin work on the construction site until February 23, 1995.

EMS submitted a statement of progress on March 21, 1995, indicating that it had only completed 35% of construction on the new steam pit, which was to have been completed by March 3, 1995. In addition, the progress report indicated that no work had com-

menced on the removal and replacement of the steam and condensate pipes. EMS was still several weeks behind its scheduled performance milestones in the middle of April, 1995. The Government requested that EMS take necessary steps to improve its progress on May 15, 1995 and instructed EMS to provide the Government with a supplemental progress report to demonstrate how EMS planned to regain progress. At that point, EMS did not offer any explanations for its lack of progress.

Because EMS encountered piping that was not indicated in the Government's drawings, the Government requested that EMS provide it with a proposed cost increase on May 26, 1995. EMS informed the Government that it would not require any additional days to be added to the contract completion date, but it continued to fail to make adequate progress under the contract throughout June and July, 1995. On August 4, 1995, the Government notified EMS that it was at least five weeks behind schedule and that it must take immediate steps to improve progress by September 15, 1995. EMS responded that it had experienced several delays due to rainfall but offered no further excuse for delays.

Unsatisfied with EMS's excuse and delays, the Government held a meeting with EMS's representatives on September 11, 1995 to discuss why little work had been performed and to express concern over EMS's use of too few workers on the project. The Government claims the EMS representatives did not raise any issues justifying its failure to make progress and that EMS representatives did not ask for any equitable adjustments to the contract price, or for any extensions of the contract completion date. The Contracting Officer (CO) contacted EMS's president on September 12, 1995 since he was not present at the earlier meeting. The Government notified EMS that it could expect a cure notice if the project was not on schedule by the milestone date of September 15, 1995. By this point, the Government had granted EMS permission to work several weekends in an effort to make up some of its work.

The Government issued a cure notice on September 19, 1995, informing EMS that its failure to improve progress and meet the approved contract milestones by September 15, 1995 was a condition endangering performance of the contract. The Government conducted a further review of EMS's progress on October 5, 1995. In so doing, the Government found that EMS had not yet installed 2,125 linear feet of the required 5,205 linear feet of pipe between the pits, nor had it installed 100 linear feet of the required 210 linear feet of pipe within the pits. The Government calculated that EMS was at least 115 days from completing the contract.

The Government terminated its contract with EMS for default on October 10, 1995. The Government claims that at the time of termination, EMS had completed only approximately 60% of the required pipe installation, 50% of required electrical work, 30% of pit work, and none of the required work for insulation, landscaping and patch work. The Government further argues that a review of EMS's payroll records revealed that EMS had not made sufficient attempts to accelerate progress to meet the contract requirements. After the termination, EMS responded with an explanatory letter on October 16, 1995, outlining the delays caused by differing site conditions and a further request for an extension of time. The Government rejected these documents.

## III. Discussion

### A. Law

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed.Cir. 1993). The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the nonmoving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser*

*Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

 The contract at issue incorporated FAR § 52.249–10, which permits the Contracting Officer to terminate a contract for default if the contractor "refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in th[e] contract including any extension, or fails to complete the work within this time." 48 C.F.R. § 52–249–10(a) (1984). This decision is discretionary, based upon the Contracting Officer's business judgment. *Florida v. United States*, 33 Fed.Cl. 188, 196 (1995); *aff'd*, 81 F.3d 1093 (Fed.Cir.1996). While the Contracting Officer is required to exercise this discretion in order to ensure that the termination is in the "best interests of the Government," *Nuclear Research Corp. v. United States*, 814 F.2d 647, 649 (Fed.Cir.1987), the Contracting Officer may not do so in an arbitrary and capricious manner. *Darwin Constr. v. United States*, 811 F.2d 593, 596 (Fed.Cir.1987).

 In order to terminate for default for failure to make progress, the Contracting Officer must reasonably believe that there existed no reasonable likelihood that the contractor could complete the contract within the time remaining for performance. *Danzig v. AEC Corp.*, 224 F.3d 1333, 1336 (Fed.Cir. 2000); *Morganti Nat'l, Inc. v. United States*, 49 Fed.Cl. 110, 129 (2001). In practice, a termination for failure to make progress generally occurs where a contractor falls so far behind schedule that completion of the contract by the completion date is unlikely. *Morganti*, 49 Fed.Cl. at 129. In reviewing the Contracting Officer's decision to terminate a contract for default, courts may consider the contractor's failure to meet its own representations concerning its progress, the percentage of work completed and the percentage of time expended, as well as monthly progress reports indicating delivery will be late. *Id.* at 130.

 A termination for default may be converted to a termination for convenience where the contractor can establish that "[t]he delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the [c]ontractor." *Id.* at 132. For terminations of convenience, the parties will seek to negotiate an agreement that will compensate the contractor and the subcontractors for the work done and preparations made for the terminated portion of the contract. 48 C.F.R. § 49.201 (2002).

B. Analysis

1. The Legal Standard for Proper Notice

The Differing Site Condition clause of FAR § 52.236–2 provides that:

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

The threshold issue for the Court to determine is whether any potential differing site condition claims are barred by a lack of timely written notice by EMS to the Government. If notice to the Government was not timely, then the entry of summary judgment *would* be appropriate because, as a matter of law, EMS would be unable to assert claims for differing site conditions to show excusable delay rather than default.

 The standard for this notice is that when the contractor encounters the differing site condition, it must "promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer . . . ." FAR § 52.236–2(a). Case law indicates that the notice need not be in any particular form (despite the FAR requirement of a writing) so long as it is sufficient to generally inform the Government of the facts surrounding the claim. *Dawco Constr., Inc. v. United States*, 18 Cl.Ct. 682, 693 (1989). Mere notice or knowledge that the contractor encountered a "condition" falls short of the contractual requirement that the contractor notify the Gov-

ernment that it considered the condition to constitute a "differing site condition." *See Schnip Bldg. Co. v. United States*, 227 Ct.Cl. 148, 645 F.2d 950, 957–60 (1981) (holding that the Government did not have constructive notice of a differing site condition from regular inspection of a job site where plaintiff did not notify government inspectors that it encountered conditions different from those described in the contract).

■ There is also authority that indicates that if the contractual notice requirement is deficient, yet the Government had *actual* knowledge of the differing site condition and suffered no injury or prejudice due to the deficiency, the contractor's failure to comply with the formal notice requirements does not bar its claim. *See CSH Contractors, Inc.*, NASA BCA No. 476–2, 77–2 BCA ¶ 12,814, 1977 WL 2638 (Sept. 30, 1977); *Big Chief Drilling Co. v. United States*, 15 Cl.Ct. 295, 303 (1988).

Based on these legal standards, the Court must determine whether EMS gave the Government proper notice of a differing site condition and, if not, whether the Government had actual knowledge and suffered no prejudice so as to allow any such claim to proceed.

## 2. Was Notice Proper?

■ Upon reading the parties' briefs prior to oral argument, it appeared to the Court that the notice issue was factual in nature due to disputes of evidence (affidavits, depositions, QCRs (Quality Control Reports), and daily logs). Such a determination would have led the Court to deny summary judgment rather than weigh the sufficiency of the evidence, which would be inappropriate at this stage in the litigation. At the oral argument held on December 17, 2002, however, the Government proffered that even if the Court were to take as true the facts alleged by EMS, the Court would still find that EMS had provided insufficient notice to the Contracting Officer of a differing site condition. In construing the evidence in favor of EMS, the Court can determine as a matter of law whether the notice was sufficient under FAR § 52.236–2.

■ Based on careful examination of the evidence submitted by EMS in support of its opposition to the Government's motion, EMS appears to concede that it did not comply strictly with the notice requirement of FAR § 52.236–2(a). EMS never provided a written submission to the Government in which it specifically alleged a "differing site condition." Nevertheless, EMS contends that the Government had actual knowledge of a differing site condition and suffered no injury or prejudice because it was given the opportunity to investigate the site of the alleged condition.

Specifically, EMS states that the Government had actual notice of problems and delays continually encountered by EMS. As proof, EMS submits QCRs, IDRs (Inspector's Daily Reports), the affidavit of EMS President, Mr. James D. Trapane; the deposition of EMS Vice President, Mr. Jeff Brooks; the deposition of Government Inspector, Mr. Otis Hillis; and the deposition of DPW Management Official, Mr. Dwain Elder. All of this evidence supports the position that the Government was put on notice of problems encountered by EMS that led to delays in the completion of the project.

The issue then before the Court is whether this actual notice (which never explicitly informed the Government of a "differing site condition") is sufficient or whether it prejudices the Government. Despite EMS's argument that the *CSH Contractors* case is analogous because the government there was not prejudiced by the contractor's failure to give formal notice of a claimed changed condition, that case can be distinguished. There, the contracting officer and the construction manager made site visits based on verbal "rumblings" of an alleged changed condition. In the present case, however, the Contracting Officer never visited the job site because the rumblings (*e.g.*, the QCRs, IDRs, deposition of Mr. Brooks) complained of conditions that the Government fully expected EMS to encounter. The Government was aware that EMS would need to pump water from the trenches and pits. The contract itself contemplated such action, including specifications requiring that sump pumps capable of continuously pumping water be placed in the

pits to remove water. The Government was also aware that EMS would need to remove existing pipe. Moreover, even when EMS encountered piping not indicated in the Government's drawings, it still informed the Government that it would not require any additional days to complete the contract. EMS maintained that position throughout the life of the contract, failing to request either an equitable adjustment to the contract price or any extension of the contract completion date at the September 11, 1995 meeting.

Thus, the failure of the Contracting Officer to visit the site does not establish a lack of prejudice to the Government. Rather, the lack of formal notice does indeed establish a prejudice to the Government because as a result of this insufficient notice, the Government simply saw no reason to investigate any alleged differing site condition. If the Court were to overlook EMS's failure to comply with the formal notice requirements of FAR § 52.236–2(a) and find that actual notice was sufficient, the Government would surely suffer a prejudice. It would be forced to defend against conditions anticipated in the contract of which it was not properly notified. Such insufficient notice directly precluded the Government from investigating the site and potentially minimizing extra costs that the contractor ended up having to incur. *See Schnip Bldg. Co.*, 645 F.2d at 959–60 (affirming the finding by the Armed Services Board of Contract Appeals that the lack of timely notice was prejudicial to the government because it "effectively prevented any verification of appellant's claim and also the employment of alternate remedial procedures.").

## IV. Conclusion

Based on the Court's determination that EMS gave insufficient notice to the Government of its claims of differing site conditions, the Court need not consider the merits of such claims.

Therefore, the Court affirms the Government's termination of Contract DAAH03–94–C–0087 for default. It is hereby ORDERED that the Government's Motion for Summary Judgment is GRANTED.

The Clerk of the Court is directed to dismiss the complaint with prejudice.