ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Harry Pepper and Associates, Inc. | ) | ASBCA Nos. 62038, 62039, 62040 |
| | ) | 62041, 62042 |
| Under Contract No. NNS14AA30T | ) | |

APPEARANCES FOR THE APPELLANT:    David W. Mockbee, Esq.
D. Wesley Mockbee, Esq.
  Mockbee Hall & Drake, P. A.
  Jackson, MS

APPEARANCES FOR THE GOVERNMENT:    Scott W. Barber, Esq.
  NASA Chief Trial Attorney
Jeffrey A. Renshaw, Esq.
Shannon A. Sharkey, Esq.
  Trial Attorneys
  Stennis Space Center, MS

OPINION BY ADMINISTRATIVE JUDGE THRASHER ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND APPELLANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

The National Aeronautics and Space Administration (NASA or government) filed a motion for summary judgment based on Harry Pepper & Associates' (HPA's or appellant's) failure to follow contractual notification procedures for impacts to schedule and cost, which it now claims in these five appeals. NASA's motion also asserts the affirmative defense of accord and satisfaction as to ASBCA No. 62040 based upon Modification No. 2 to the contract. Appellant cross-moved for partial summary judgment to dismiss this affirmative defense as it applies to ASBCA Nos. 62039 and 62040. Due to NASA having had actual and constructive notice of some claims, and genuine issues of material fact as to the others, we deny the first basis of NASA's motion. Due to the limited release language in Modification No. 2, we deny NASA's motion on its second basis and grant appellant's cross-motion as to the application of the affirmative defense of accord and satisfaction in 62039 and 62040.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

1. NASA awarded Contract No. NNS12AA84B (the contract), a multiple award construction contract to HPA, on August 3, 2012. On January 9, 2014, NASA awarded HPA Task Order NNS14AA30T (TO) for restoration of the B2 Test Stand at the John C. Stennis Space Center, MS, valued at $36,577,459. This involved relocation of the Main Propulsion Test Article (MPTA) Superstructure, reinforcement of Battleship

Point,[1] and other tasks. (R4, tab 2 at 94-95) On February 7, 2014, NASA issued HPA a Notice to Proceed, which HPA acknowledged the same day. This document indicated all work was to be completed by March 14, 2015. (R4, tab 3 at 132)

2. Relevant to the government's motion, the contract included the following four clauses which required HPA to notify the contracting officer (CO) when it encountered circumstances contrary to contractual expectations or for which claims might be submitted (the relevant portions are italicized here):

(1). NFS 1852.242-70, TECHNICAL DIRECTION (SEP 1993) (clause G-2), which reads in pertinent part:

(a). . . . 'Technical direction' means a directive to the Contractor that approves approaches, solutions, designs, or refinements; fills in details or otherwise completes the general description of work or documentation items; shifts emphasis among work areas or tasks; or furnishes similar instructions to the Contractor....

(b) The [Contracting Officer Technical Representative] COTR does not have the authority to, and shall not, issue any instruction purporting to be technical direction that --

(1) Constitutes an assignment of additional work outside the statement of work;

(2) Constitutes a change as defined in the changes clause;

(3) Constitutes a basis for any basis for any increase or decrease in the total estimated contract cost, the fixed fee (if any), or; or the time required for contract performance;

(4) Changes any of the expressed terms conditions, or specifications of the contract; or

(5) Interferes with the Contractor's rights to perform the terms/conditions of the contract.

(d) The Contractor shall proceed promptly with the performance of technical direction duly issued by the COTR

---

[1] The "Battleship" was not an actual battleship, but was a frame used to support a rocket booster to be tested on the B2 Test Stand.

in the manner prescribed by this clause and within the COTR's authority.

If, in the Contractor's opinion, any instruction or direction by the COTR falls within any of the categories defined in paragraph (b) above, the Contractor shall not proceed but shall notify the Contracting Officer in writing within 5 working days after receiving it and shall request the Contracting Officer to take action as described in this clause. [Emphasis added]

(f)  Any action(s) taken by the Contractor in response to any direction given by any person other than the Contracting Officer or the COTR shall be at the Contractor's risk.

(R4, tab 1 at 23-24)

(2).  FAR 52.236-2 – DIFFERING SITE CONDITIONS (APR 1984):

*(a)  The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of --*

(1)  Subsurface or latent physical conditions at the site which differ materially from those indicated in the contract; or

(2)  Unknown physical conditions at the site, or an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

. . . .

*(c)  No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph  (a) of this clause for giving written notice may be extended by the Contracting Officer.*  [Emphasis added]

(R4, tab 1 at 38)

3

(3). FAR 52.243-4, CHANGES (JUN 2007):

> (d) If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, *except for an adjustment based on defective specifications*, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. *In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.* [Emphasis added]

(R4, tab 1 at 39)

(4). FAR 52.242-14, SUSPENSION OF WORK (APR 1984):

> (c) A claim under this clause shall not be allowed-
>
> (1) For any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order); and
>
> (2) Unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

(R4, tab 1 at 22)

3. Specification 200HF-G013, section 050523, paragraph 1.5.1 states:

> Contractor shall perform fabrication/erection inspections as necessary prior to assembly, during assembly, during welding, and after welding to ensure that materials and workmanship meet the requirements of the contract documents. . . . Unacceptable welds shall be immediately

4

repaired and made ready for Government re-inspection at no additional cost to the Government.

(R4, tab 18 at 1803-04) Drawing G-0001 in Engineering Modification Instructions 12NCBZ-19 (EMI 19), related to work on the Core Stage Support Superstructure, under "Structural Steel" Note 3, states "[t]ypical materials for carbon steel construction are: Plates, Angles, Channels and S-Shapes shall be ASTM2 A36," and "[w]ide flange shapes and their tees shall be A992." (R4, tab 5 at 189, tab 6 at 257) (emphasis in original) HPA subcontracted with Quality Iron Fabricators, Inc. (QI) and with Valor Construction Management, LLC (Valor) for designated portions of the required fabrication and erection of the Structural Steel and Miscellaneous Metals Work for the Project. QI and Valor, in turn, subcontracted with River City Erectors (RCE) for erection of the Project. (App. supp. R4, tabs 6-9)

4. As part of its bid, HPA provided a Quality Assurance Plan. This mandated that one HPA representative would be solely responsible for a three-phase inspection approach: "preparatory, initial, and follow-up inspection[s]." At the initial phase, "[i]f the quality of the work is found to be nonconforming the work will be removed and replaced" and during the follow-up phase, "[n]on-conforming work found during these inspections will be removed and replaced." (R4, tab 55f at 3425) HPA provided that "[u]nacceptable welds shall be immediately repaired . . . at no additional cost to the government" (R4, tab 55f at 3426). HPA also provided an organizational chart, listing Mr. Chuck Stewart as a field production manager with HPA (R4, tab 56p).

*ASBCA No. 62038*

5. As part of the reinforcing of Battleship Point Loads for the MPTA move work, which was designated by EMI 12NCBZ-20 (EMI 20), the TO required installation of 28 wide flange steel shapes cut into two "T" shapes, referred to as "WTs" (R4, tab 6 at 260-61). Section 01 11 00 of Specification 200HF-G013, paragraph 1.1.3 stated "some of [these] will be installed by lowering them through temporary holes in the battleship top plate" (R4, tab 18 at 1694).

6. On March 31, 2014, NASA sent HPA Transmittal 13 discussing several changes to the location of bolts in the work and noting that it was "currently preparing revised drawings" which it would provide to HPA. This included sheets S-101 and S-301 of EMI 20 as well as sheets related to Relocation of the MPTA Superstructure. Transmission 13 also contained the following text: "**NOTE: ** 'Any comment(s) that result in a change to the contract cost, scope, or schedule you must notify the**

---

[2] ASTM International, formerly known as American Society for Testing and Materials, is an international standards organization that develops and publishes voluntary consensus technical standards for a wide range of materials, products, systems, and services.

**Contracting Officer for approval prior to implementation or any costs are incurred.'"** (R4, tab 53f at 3191-92) (emphasis and syntax in original) (hereinafter "Prior Approval Note Text") The Board understands the Prior Approval Note Text to be, in essence, a reminder of the contract notice provisions, and not a change to those requirements. On April 18, 2014, HPA sent NASA Request for Information (RFI) 54 stating "[f]abrication of the new base plates and layout/drilling of bolt holes at the new MPTA location are delayed until the revised drawings are received." The contracting officer's representative (COR) answered this request four days later, providing the drawings and stating there "will be a Structural FCR [Field Change Request] that captures these changes along with other RFI guidance." This response also included the Prior Approval Note Text. (R4, tab 53h at 3196-97)

7. FCR 6, dated April 17, 2014, incorporated these changes, stating "[c]onnection and Baseplate details are revised and added to the design package" (R4, tab 53i at 3202). Much of the included materials in this version of FCR 6, including a drawing with a handwritten note which states "RFI 040" are compressed to the point of illegibility. After discussions between the parties, HPA later submitted a revised version of FCR 6 to NASA on August 1, 2014, contemplating a contract value increase of $335,324.14 and an impact of 10 calendar days of schedule impact. This FCR also incorporated "remov[ing] . . . WT's previously installed in the original contract location and install[ing] them in the new locations (RFI 040)" (R4, tab 53j at 3208). RFI 40 does not appear to be in the Rule 4 file. However, FCR 6 includes a submission from HPA, stating RFI 040 involved "a credit for the original connection material" and that this RFI "did not impact Quality Iron's cost or schedule for EMI's 18 [for MPTA Relocation] & 20" (R4, tab 53j at 3251; *see also id.* at 3261-73) (explaining the basis for the credit due NASA). Appellant maintained moving these WTs was a "change to ongoing work, [and] we anticipate a schedule impact of 10 calendar days to complete this scope of work" (R4, tab 53j at 3208). On January 16, 2015, HPA submitted another revised FCR 6 "removing [the WT relocation] costs from the attached . . . [p]roposal" as NASA "has taken the position that relocation of WTs . . . should be at no cost to the government" and that they planned to "pursue reimbursement for the additional costs in an REA [(Request for Equitable Adjustment)]" (R4, tab 53k at 3286). No other versions of FCR 6 appear to be available. FCR 6 was incorporated into the contract via Modification (Mod.) No. 9 signed February 3, 2015 (R4, tab 53l).

8. On April 29, 2014, HPA submitted RFI 62 to NASA which read as follows:

> The current detail calls for removal of the 2 1/4" Battleship Top Plate, installing the split tees, and then re-welding the 2 1/4" Top Plate. Removing and reinstalling the top plate will generate a considerable amount of heat d[ur]ing pre and post heat as well as during the welding process, which could introduce a considerable amount of warpage. In order to eliminate the possibility of warpage in the top plate, RCE

6

>[River City Erectors, appellant's subcontractor] proposes cutting the 27′-5 1/2″ long split-tees into three equal pieces and installing them as [originally planned] utilizing the access hole at the North side. This would eliminate the need to cut holes in the Battleship Top Plate. The two seams for the split-tees will then be welded using a prequalified AWS D1.1 PJP [partial joint penetration] procedure. Please confirm this is acceptable.

(R4, tab 53b at 3159) The COR replied on May 1, 2014, stating "The proposed means of construction is acceptable" and added the Prior Approval Note Text (*id.* at 3158). HPA has alleged that the work involved with moving the WTs into the Battleship through the north entrance, rather than through the top plate, took place between May 1 and August 11, 2014 (app. supp. R4, tab 23c at 691-98). On July 31, 2014, NASA's COR revised the answer to RFI 62 as follows: "The process is acceptable, however, welds shall be CJP [complete joint penetration] welds with all documentation requirements to be met. The welds shall be tested and upgraded to CJP welds before any new superstructure steel is erected," followed by the Prior Approval Note Text. (R4, tab 53c) Thereafter, on October 8, 2014, HPA sent NASA a letter explicitly stating "NASA's revised response to RFI-062 constitutes a constructive change" (app. supp. R4, tab 20 at 584).

9. On August 26, 2014, HPA submitted RFI 62A to NASA "to suggest the following solution in lieu of testing and upgrading PJP[3] welds to CJP welds. It is suggested that a diamond shaped . . . 1/2″ thick plate be welded with a 5/16″ fillet weld[4] on each of the PJP welds that do not pass inspection" and included three drawings for reference. NASA's COR responded on September 4, 2014, accepting the proposal with caveats, and included the Prior Approval Note Text. (R4, tab 53e) HPA incorporated this change in FCR 37, submitted to NASA October 27, 2014, requesting an additional $118,439 and 17 days (app. supp. R4, tab 10 at 309).

10. HPA submitted RFI 140 to NASA, stating "[t]he existing condition of the web plate of the battleship is warped and uneven" and recommended some WTs "be cut to fit, in no more than three sections. This process will allow the WT sections to be attached to the web plate of the battleship and achieve the acceptable tolerances for [CJP] weld required." The date this was sent is unknown, as the original is not available, but

---

[3] Partial Joint Penetration (PJP) groove weld is a groove weld that does not extend completely through the thickness of components joined.

[4] Fillet welding refers to the process of joining two pieces of metal together when they are perpendicular or at an angle. These welds are commonly referred to as tee joints, which are two pieces of metal perpendicular to each other, or lap joints, which are two pieces of metal that overlap and are welded at the edges.

appellant's REA 1 includes NASA's answer, dated August 6, 2014, accepting this change and including the Prior Approval Note Text.  (App. supp. R4, tab 18 at 573)

11.  HPA submitted REA 1 on June 29, 2015, requesting compensation for relocation of the WTs and additional welding and trimming of WTs in the Battleship (app. supp. R4, tab 18 at 477-79).  HPA submitted REA 4 on January 11, 2016, requesting compensation for the changes detailed in FCR 37 (the result of RFI 62's revision and 62A's clarification), which HPA stated had been denied (app. supp. R4, tab 20 at 577-78).  These were both supplemented on July 5, 2017, and a fourth compensation request was added for the cost of bringing the WTs into the Battleship via the north entrance rather than lowering them through a temporary hole in the top plate (app. supp. R4, tab 23c at 634-35).

12.  The CO issued unilateral Mod. No. 44 on August 10, 2018, allowing $415,356 "[i]n total for REA 1 and 4 combined."  In Box 13A, the modification reads "THIS CHANGE ORDER IS ISSUED PURSUANT TO" and the CO inserted "FAR 52.236-2, Differing Site Condition."  (R4, tab 53m at 3330-31)

13.  HPA later resubmitted REAs 1 and 4 as certified claims on December 19, 2018, requesting $2,687,848.40 and a 90-day extension, which NASA subsequently denied (R4, tabs 48, 53).  Among the bases for denial, the CO stated HPA had not notified NASA of any of the bases for its claims of additional work or cost in accordance with the contract provisions (R4, tab 53 at 3143, 3146, 3148).  This denial was timely appealed and docketed as ASBCA No. 62038.

*ASBCA Nos. 62039 and 62040*

14.  As part of the reinforcement work for the MPTA's relocation, Sheet S-505 of EMI 18, Note 2 stated "existing plates [underlying 16 designated columns] are to be covered by new 2-1/2" thick A36 steel plates cut to fit the columns with . . . edge preparations for CJP and PJP welds."  Note 5 of that sheet states "CJP and PJP welds requir[ing] 100% UT [Ultrasonic testing] with a written report for the NASA COR."  Note 6 states "[p]arts of existing gusset plates and parts of some welds will need to be partially removed as noted in the drawing to allow proper fit up and welding."  (R4, tab 4 at 179)  Other locations, marked with the 3 flag icon, required HPA to "bevel around existing column flanges and fillet welds as required for base [plate] installation."  (*Id.*)

15.  HPA stated in its opposition to the present government motion that work on this requirement took place between September and October of 2014 (app. opp'n at 32; citing ex. 3, aff. of J. Philips ¶ 8).  HPA's opposition also incorporates its REA 9 as a whole, which similarly states "the vast majority of the work" on installation of the

doubler baseplates[5] occurred "during the period from August 26 through October 26, 2014" (app. supp. R4, tab 29b at 1405). NASA has not indicated disagreement with either of these timelines. For purposes of this motion, we find HPA states in its brief that the work was performed in September and October 2014 and NASA does not dispute this.

16. HPA submitted RFI 146A, dated August 13, 2014, to NASA indicating that Note 2 of Sheet S-505's

> design of the plates does not allow for verification of the CJP weld by UT [Ultrasonic Testing] (Due to the geometry and thickness of the baseplate there is not enough skip distance[6] in order to obtain an accurate UT inspection.) We suggest performing the welds as designed under the supervision of NASA's CWI [certified welding inspector] or designated representative and request to waive the UT requirements for the aforementioned CJP welds.

(R4, tab 54e) The COR answered this request on August 26, 2014, stating "[t]his is acceptable. Continuous visual inspection should be conclusive. Submit FCR [34] for change in requirements." The answer then included the Prior Approval Note Text. (R4, tab 54f)

17. On August 14, 2014, HPA submitted RFI 146, indicating to NASA that "[e]xisting conditions, in the form of welds on W14 columns for MPTA, prevent the 2-1/2" thick plates," which Sheet S-505 required, "from achieving proper CJP welds" in accordance with required standards. "In addition edge preparations for CJP welds in some instances may impact 1-9/16" bolt holes in doubler plates. . . . Please advise how to proceed." The COR responded five days later with revised sketches, and included the Prior Approval Note Text. (R4, tab 54d) These sheets detailed preparation of the plates for welding, both adding to and clarifying Sheet S-505. The final page, discussing connecting the new plate to the column, states "with the existing column to base plate weld staying, a large chamfer[7] is needed on the edge of the new plate." Viewed in

---

[5] A small piece of plate attached to a larger area of plate that requires strengthening in that location. Usually at the attachment point of a stiffener. Also, a flat plate welded to a plated structure that has suffered damage.

[6] Skip distance (SD): The "skip distance" is the surface distance from the probe "index point" where the sound beam returns to the surface. This distance must be calculated to determine the probe distance to the weld to provide full inspection coverage for the component thickness.

[7] A chamfer is a transitional edge between two faces of an object. Sometimes defined as a form of bevel, it is often created at a 45° angle between two adjoining right-angled faces.

9

cross-section, this chamfer removes part of the bottom side of the new plate closest to the column in order to make room for the existing weld as it connects the old plate to the column. The drawing also states "CJP is needed so weld edge prep is needed," then "a vertical plate edge [instead of a chamfer] may be best. There is a groove here; fill it up then add a 5/16" fillet weld." (*Id*. at 3356)

18. HPA submitted FCR 34 on September 15, 2014, "[p]er NASA response to RFI 146A, omit[ting] the requirement for Ultrasonic testing of the CJP welds" for the reinforcing plates shown on sheet S-505, and crediting NASA $2,136.77 (R4, tab 47d). This change was incorporated into the contract via (bilateral) Mod. No. 2, dated October 16, 2014 (R4, tab 47e). Mod. No. 2 contained language releasing NASA "from any & all liability under this contract for further equitable adjustments attributable to the above change" (*id.* at 2490).

19. On March 6, 2015, HPA "was notified that an ex-employee of RCE had made an allegation that . . . at three locations filler material had been placed into the weld" while performing this work in late 2014. The filler material was later found to be a bolt, which was covered up as the welder welded. (R4, tabs 55j, 55m) This process is known as "slugging" the weld, and though it speeds up the welding process, as less volume has to be filled, it reduces the strength of the weld, and is thus not up to standard.

20. Appellant had a meeting with NASA and its subcontractors to discuss this event on March 9, 2015. The following day, HPA sent another of its subcontractors, Quality Iron Fabricators, a letter stating "if the allegation is found to be true be advised that QIF will be held responsible for all costs associated with investigating and correcting all of the deficient work." (R4, tab 55j) Appellant began inspecting all sixteen columns by March 18, 2015, to find which welds had been slugged, and though many columns tested positive for voids, appellant admits it was only able to find two slugged welds, not the three alleged by RCE's ex-employee. (App. opp'n at 10)

21. On March 19, 2015, HPA issued Non-Conformance Report (NCR) 12 to Quality Iron, who was listed as the "Contractor/Vendor Responsible Individual" about "unapproved welds at column 11 level 11. There is an ongoing investigation of all the MPTA base plates reinforcement installation. UT inspection of a number of other columns 6-7-8-11-12 shows voids in the installed welds." The deficiency listed was "[f]ailure to follow proper welding procedure on the MPTA base Plates reinforcements. Upon UT investigation of the areas in question. HPA's Welding Inspector has found voids a number of locations." (R4, tab 55l at 3440 (syntax in original); *see also* tab 56l, (citing the same concerns)) This NCR required a corrective plan from Quality Iron by the following day (R4, tab 56l).

22. During testing, appellant found what it characterized as "defects" in 11 of the 16 base plates (R4, tab 47v at 2555, 2791-2838, tab 54i, tab 55n; app supp. R4, tab 32 at 1701). HPA submitted Quality Iron's Corrective Action Plan (CAP) to NASA via

10

RFI 263, dated March 30, 2015, indicating it would repair the issues it had found at the base plate welds via "air arc gouging and then repair the defective welds with new weld metal" (R4, tab 47v at 2592, 2595). This plan also proposed to "[l]ocate defective welds through the use of UT inspection and determine which parts of these welds needs[sic] to be repaired" (R4, tab 47v at 2565). NASA returned this plan with comments and questions. When referring to the MPTA Base Plate Repair Procedures, the COR commented "[t]he quality of the welds are to be completed as if the welds would be inspected with UT." (R4, tab 30 at 2118) In its revised CAP submittal, HPA stated "HPA is 100% responsible for ensuring their welders or their subcontractor's welders correctly perform the work" (R4, tab 47v at 2557, 2560). This "repair work was performed between March 12 and at least June 20, 2015" (app. opp'n at 34 (citing ex. 3, aff. of J. Phillips ¶ 9)).

23. HPA blamed the failing UT test results not related to the slugged welds on the methods employed in installing the base plates which the parties had discussed in RFI 146A, i.e. due to the back bevel creating insufficient skip distance for the test. On April 27, 2015, and May 5, 2015, Quality Iron wrote to HPA to notify it of its belief that the work required to correct this issue constituted "a change in scope." (App. supp. R4, tab 33 at 1742-43) HPA forwarded this notification on to the CO via letter dated May 8, 2015 (app. supp. R4, tab 32 at 1701-02). Appellant later described the work as "torching, grinding, significant added welding, re-beveling, and fitting" the plates due to "the excessive size of the fillet weld gaps between the existing columns and the new MPTA baseplate reinforcement doubler plates" (app. supp. R4, tab 29b at 1379). Quality Iron eventually submitted a Change Order Request, dated July 28, 2015, to HPA for work done on 12 of the 16 base plates (app. supp. R4, tab 33 at 1744-45; *see also* R4, tab 49 at 3039 (indicating there were actually 16 base plates, not 29 as stated in the change order request)).[8]

24. HPA submitted REA 9, dated July 5, 2017, for changing

> welding procedures on all of the MPTA baseplate reinforcement doubler plates . . . to meet the revised welding requirements specified by NASA for the first time in response to HPA RFI #146A. This extra work was necessary due to the excessive size of the fillet weld gaps between the existing columns and the new MPTA baseplate reinforcement doubler plates.

(App. supp. R4, tab 29b at 1379) This REA requested $852,884.98 (*id.* at 1376).

---

[8] It is unclear why QI discusses 29 instead of 16 reinforcements, as appellant discusses in its briefing, but resolutions of this issue is unnecessary as the extra costs claimed in both instances are for 12 of the reinforcements.

11

25. HPA submitted REA 10, also dated July 5, 2017, for the

> extensive weld repair work required because of NASA's
> defective design directive on how to bevel and back bevel the
> plates which created voids that had to be reworked because of
> NASA's defective design, and because of NASA's failure to
> detect the two (2) bolts put in the welds by a disgruntled
> employee to slug the welds. Per NASA's Quality Control
> responsibility, NASA was obligated to have an inspector
> inspect each weld during the entire welding process of each
> weld.

(App. supp. R4, tab 34c at 1815) This REA requested $3,234,428.58 (*id.* at 1816).

26. Unilateral Mod. No. 44, dated August 10, 2018, compensated HPA $298,000 for the issues raised by this REA. As noted above, this Mod. cited the Differing Site Conditions clause for its various compensatory changes. (R4, tab 53m at 30-31)

27. HPA submitted a certified claim dated December 18, 2018, reiterating the basis for REA 9 and requesting $1,127,909.37 and a 29-day time extension (R4, tab 49 at 3039-40). Another certified claim, dated December 19, 2018, reiterated the basis for REA 10 and requested an additional $4,281,841.69 and a 39-day time extension beyond that paid under Mod. No. 44 (R4, tab 50 at 3053-54). The CO issued two final decisions (COFDs), both dated March 27, 2019, denying these claims in their entirety (R4, tabs 54-55). The COFD for the claim incorporating REA 10 states in several places that HPA failed to notify NASA of its incurrence of additional costs in accordance with the contract (R4, tab 55 at 3387-90). HPA timely appealed both of these denials, and they were docketed by the Board as ASBCA Nos. 62039 and 62040, respectively.

*ASBCA No. 62041*

28. HPA submitted to NASA welding procedure specifications, dated April 29, 2014, which RCE previously proposed as part of its work on EMI 20. These procedures proposed minimum preheat and interpass temperatures for welding various joints based on the thickness of the steel, and are listed as follows: 1/8" – 3/4" is 32º; 3/4" – 1 1/2" is 50º; 1 1/2" – 2 1/2" is 150º; and over 2 1/2" is 225º. No post weld heat treatment was anticipated. (R4, tab 56g at 3513, 3518-20)

29. HPA issued a Stop Work Order and NCR 11 dated March 9, 2015, to its subcontractor Quality Iron (who had subcontracted this work to RCE) "for improper welds and failure to provide proper Quality Control of the welding taking place on the Stennis Space Center project. Quality Iron is to provide a written corrective action for this NCR by C.O.B. Tuesday 3-19-15" (R4, tab 47r). RCE submitted a Corrective Action Report (CAR) the following day, stating the issue as "Full pen welds failed UT and welds

cracking." RCE "believed the cause of this condition is after welding has stop[ped]. The welded area cools down to[o] rapidly due to weather conditions." RCE listed the following corrective action: "We will grind /gauge out unacceptable welds and preheat, re-weld and control the cool down." The final line of the CAR states: "Extra Cost: N/A." (R4, tab 47s)

30. At some point between that CAR and April of the following year, RCE took two steel samples of about 3 pounds each, one from the Battleship and the other from the MPTA, and sent them for a material evaluation by an outside testing firm (*see* app. supp. R4, tab 37 at 2059). The testing firm produced a report dated April 5, 2016, which stated that the tensile strength[9] of the steel for the Battleship sample was "~85ksi" and the MPTA sample was "~40ksi", however it also noted that "neither sample met the size requirement for testing per ASTM A956-12 (15lb. Minimum) and therefore are deemed non-reliable" (R4, tab 56i at 3552). The report also identified the steel at issue as 1018 Carbon Steel through a chemical analysis (R4, tab 56i at 3553). Another report, dated April 18, 2016, stated the firm had reviewed hardness tests performed by Quality Iron on location, and noted "[t]he results appear to be consistent with the results" in the previous report. (R4, tab 56i at 3554) Appellant alleges Quality Iron ascertained these results with a Digital Hardness Tester calibrated on February 22, 2016 (app. supp. R4, tab 40c at 2085).

31. HPA submitted RFI 371, dated April 27, 2016, to NASA, stating they had "identified an unusually high yield stress of the existing steel structure . . . higher than those identified in the manufactured steel identified in the contract documents." HPA cautioned that if the findings "prove to be accurate that further investigation is warranted . . . and could result in weld failure." NASA's COR responded on May 6, 2016, stating "[t]he additional information and suggestions will be taken into advisement." This response also provided the Prior Approval Note Text. (App. supp. R4, tab 38)

32. HPA submitted REA 11, dated September 17, 2017, requesting $2,454,368.22 for what it deemed "the extra contractual blanketed pre- and post-heat treatment for full penetration welds for new-to-old . . . [and] new-to-new steel from and after March 9, 2015 because of the NASA directive issued to all welding trades on ongoing projects on the NASA site" (app. supp. R4, tab 40c at 2076). Neither party has pointed to, nor do we see in the Rule 4 file, a NASA directive with this date related to this content.

33. REA 11 refers simply to drawing G-001, a copy of which is included in the REA, but the REA's reproduction of this sheet is at such low quality as to blur the words to the point of illegibility. The reproduction bears a resemblance to EMI 19's Drawing G-001 provided under tab 5. (*Compare* R4, tab 4 at 165, tab 5 at 189, tab 6 at 257 *with* app. supp. R4, tab 40c at 2087)

---

[9] Tensile strength in steel is measured in kilo pounds per square inch, indicating the stress the steel can undergo before breaking.

13

34.  HPA submitted a certified claim dated December 20, 2018, reiterating the basis for REA 11, and requesting $3,258,276.09 and a 69-day extension (R4, tab 51 at 3072-73).  The CO issued a COFD dated March 27, 2019, denying the claim in its entirety (R4, tab 56).  HPA timely appealed this denial, which the Board docketed as ASBCA No. 62041.

*ASBCA No. 62042*

35.  Contract Specification 200HF-GC02 (revised September 13, 2013), Section 05 12 00, paragraph 3.3 states "connections not detailed shall be designed in accordance with AISC [American Institute of Steel Construction]" Specification for Structural Steel Buildings, dated 2010 (R4, tab 10 at 697, 701).  EMI 19, Drawing G-001, under "Structural Steel," states "Structural steel shall conform to the AISC 'Specifications for the Design, Fabrication and Erection of Structural Steel for Buildings', 13th edition" and "[w]elded connections shall conform to the latest revised code of the American Welding Society, AWS D1.1 or D1.6" (R4, tab 5 at 189).  The latter document's table of contents is provided, along with the first page of Chapter A and Appendix 5 (app. supp. R4, tab 4).  Appellant alleges the full document, in Section M.4, references the AISC Code of Standard Practice, § 7.13 (app. supp. R4, tab 43b at 2681).  The AISC Code of Standard Practice was provided in relevant part, and § 7.13 therein states "[w]hen plumbing columns, apply a temperature adjustment at a rate of 1/8 in. per 100 ft. for each change of 15°F . . . between the temperature at the time of erection and the working temperature" (app. supp. R4, tab 3 at 113).

36.  HPA and Quality Iron submitted RFI 292, dated June 12, 2015, discussing

> the current "heavy" connections . . . call[ing] for 13/16"
> diameter holes in both the beam and the angle clips.  In an
> effort to aid fitment and adjustment, the contractor proposes
> replacing the angle clips with L5x5x1/2" w/ 13/16" dia. X 2"
> slotted holes. . . .  This recommendation is proposed at no
> additional cost to NASA.

(App. supp. R4, tab 43b(3) at 2868)  The COR responded by letter dated June 15, 2015, stating this "is acceptable" with some caveats, and included the Prior Approval Note Text (*id.* at 2867).  Appellant then submitted RFI 292A, dated September 16, 2015, "request[ing] further clarification. . . .  The proposed solution i[s] within AISC specifications.  Please advise how to proceed" (*id.* at 2863).  The COR responded with an answer explaining how to tighten bolts and weld joints, and included the Prior Approval Note Text (*id.* at 2864).

37.  Quality Iron sent a letter to HPA dated May 16, 2016, which seems to continue a dispute between personnel of the two companies about "movement of the

14

stand [which, according to Quality Iron,] has been verified through hard measurements and surveys over the past year via multiple entities including HPA personnel." This document goes on to cite various documents, surveys, measurements, and pictures, though it is unclear if any of these have been provided in the Rule 4 file. One document cited in this letter is RFI 275, which only appears in the Rule 4 file as a retyped reproduction. (Gov't amend. mot. ex. A at 1; app. supp. R4, tab 43b at 2749)

38. HPA submitted REA 12 on October 18, 2017, alleging "multiple relocation[sic] of steel members and extensive additional welding required because of unanticipated thermal movement and vibration of the existing steel structure" (app. supp. R4, tab 43b at 2680). This document states that, aside from the contract's alleged incorporation of the AISC Code of Standard Practice, the contract is silent as to thermal variants in steel (app. supp. R4, tab 43b at 2682-83). This REA also includes reproductions of many communications between HPA and its subcontractors dated between March 23, 2015, and May 6, 2016 (*id.* at 2748-85). In introducing these documents, it states "that work which should have required only days to complete actually took months because of the moving structure as constantly noted on reports, RFI's[sic], emails and other forms of communication. The below are excerpts from many of those complaints" (*id.* at 2748). This document also includes retyped reproductions of several RFIs, including 275, 76.1, 315, 85, and 113 (*id.* at 2749-50, 2757-59, and 2766). Due to their reproduction, it is not possible to determine who sent these, to whom, nor who answered, much less verify their contents.

39. HPA's reproduction of RFI 275, allegedly dated May 5, 2015, does discuss "thermal expansion & contraction [which] alters the shape of the Corvette" and proposes "that the Corvette top plate be trimmed 1" on both the Eastern and Western sides." This reproduction provides as an unattributed answer "[i]t is acceptable to trim the plates as requested to allow the removable platform to fit." This reproduction does not indicate who answered this RFI or when, and does not indicate whether the Prior Approval Note Text was included. (App. supp. R4, tab 43b at 2749)

40. In HPA's reproduction of RFI 76.1, allegedly dated June 11, 2015, RCE proposes "an effort to aid fitment and adjustment" which is "proposed at no additional cost to NASA." This document also requests a response by June 25, 2015, but no response is indicated. (App. supp. R4, tab 43b at 2749-50)

41. HPA's reproduction of RFI 315, allegedly dated August 26, 2015, references a photo which is not provided, stating it "shows that a gap exists between the two infill beam connections. . . . This is believed to be a result from heat input during welding causing the plate to draw." The RFI continues, "[t]he only solution is to leave as is or cut the lower welds out, tighten the bolts and re-weld while filling any gap with weld, in place. This RFI has been generated to bring the issue to NASA's attention." This RFI reproduces an answer without a date, name, or indication of the Prior Approval Note

Text, advising the requester to "[c]ut the lower welds out, tighten the bolts and re-weld while filling any gap with weld, in place." (App. supp. R4, tab 43b at 2757)

42. HPA's reproduction of what it refers to as "RFI 85," allegedly dated September 2, 2015, seems to be a follow-up of RFI 292[10] (app tab 43b(3) at 2863), which had raised an issue and proposed a solution "to aid fitment and adjustment" which was proposed "at no additional cost to NASA." This RFI requests an answer by September 16, 2015, though none is included. The RFI states there is no schedule nor cost impact associated with the issue. (App. supp. R4, tab 43b at 2758-59)

43. HPA's reproduction of RFI 113, allegedly dated March 22, 2016, discusses "allowable deviation in the Forward Attachment support and AFT Bracing for elevation and location proportional to the thermal expansion and/or wind loads." This RFI requests a response by April 5, 2016, though none is included. The RFI reproduction anticipates there will be a schedule and cost impact. (App. supp. R4, tab 43b at 2766)

44. Appellant submitted a certified claim dated December 20, 2018, reiterating the basis for and incorporating REA 12, and requesting $4,102,121.47 and a 227-day extension (R4, tab 52 at 3115-16). The CO issued a COFD dated March 27, 2019, denying this claim in its entirety (R4, tab 57). HPA timely appealed this denial, and the Board docketed this appeal as ASBCA No. 62042.

DECISION

At the outset, it is important to distinguish to which allegations in HPA's complaint this decision does and does not apply. The government submits a Motion for Summary Judgment alleging two bases, although many of its arguments appear to go to the merits of HPA's claims. The first is "Appellant's failure to comply with notice/Contracting Officer approval provisions contained in the contract, and" as relates to ASBCA No. 62040, the affirmative defense of "Accord and Satisfaction (this claim has already been settled), all of which therefore bars Appellant's claims made in its Complaint." (Gov't mot. at 1) Regarding the first basis, several theories appellant advances within its complaint do not contain notification requirements, either in their associated FAR clauses or within a contract provision, and/or apply independently of any notification requirement. Thus, these are not implicated by this motion and will not be discussed herein, except to be identified as follows.

_____

[10] It would be odd, indeed, if RFI 85 *followed* RFI 292. We believe, based on HPA's reference to "QI 85" in correspondence about RFI 292a, that it meant to refer to QI 85, rather than RFI 85 in this REA. RFI 292a, in fact, did include an answer (app tab 43b(3) at 2863). In the end, this (and other potential occurrences of mislabeling QIs as RFIs in HPA's REA) is immaterial to the motion before us.

*I. Appellant's Theories Which Will Not Be Addressed*

All five of these appeals involve, we believe, the theory that the government has breached the duty of good faith and fair dealing, which appellant refers to as both a "duty not to delay, hinder, or interfere with the work of HPA and its subcontractors" and a "duty to cooperate"[11] (compl. ¶¶ 17, 23, 30, 35, 40). Appellant also cites to the government's "failure to disclose its superior knowledge of the existing conditions actually encountered" for ASBCA Nos. 62041 and 62042 (compl. ¶¶ 35, 40). Finally, appellant also references the Inspection of Construction Clause for 62040 (compl. ¶ 30). As none of these theories have a notice requirement, nor involve the provisions of the contract, which mandate appellant to provide NASA notice of the facts at issue, and the government's motion does not implicate these theories, we need not address them here.

As a final note regarding which theories will be addressed, appellant alleges NASA's design specifications were defective as they failed to disclose a differing site condition in ASBCA Nos. 62038[12], 62039, 62041, and 62042 (compl. ¶¶ 23, 35, 40).

> Although [DSC] and defective specifications claims are distinct in theory, they collapse into a single claim . . .where the alleged defect in the specification is the failure to disclose the alleged [DSC]. Where the differing site conditions claim and the defective specifications claim are so intertwined as to constitute a single claim, that claim will be governed by the specific differing site conditions clause and the cases under that clause.

*Meridian Engineering Company v. United States*, 885 F.3d 1352, 1361 (Fed. Cir. 2018) (citing *Comtrol, Inc., v. United States*, 294 F.3d 1357, 1362 (Fed. Cir. 2002)). We believe this is the case in all four appeals. Therefore we will treat these theories together under our precedent relating to the Differing Site Condition (DSC) clause. In summation, we will address theories for recovery under the DSC clause for 62038, 62039, 62041, and 62042.

---

[11] Appellant also cites to FAR 52.236-21, SPECIFICATIONS AND DRAWINGS clause in relation to 62041 and 62042 when advancing this theory, but does not explain how these theories relate to this FAR clause (compl ¶¶ 35, 40). Based on the arguments, it appears the alleged breach of the duty of good faith and fair dealing is independent from the FAR clause, and for the purposes of this motion, we will treat them as such.

[12] Appellant, in its complaint, does not assert a DSC theory of recovery related to 62038 but does so in its brief (app. opp'n at 4 ¶ 4).

## II. The Parties' Arguments on NASA's Motion for Summary Judgment

Summary judgment will be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A material fact is one which may make a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The government must establish the absence of a genuine issue of material fact, after which the burden of proof shifts to appellant to show that there is a genuine factual issue for trial. *Gerald R. Rouillard*, 14-1 BCA ¶ 35,765 at 174,991.

The government argues appellant did not gain approval from the CO prior to incurring additional costs, in conformance with the Technical Direction Clause (SOF ¶ 2 (1)), the Changes Clause (SOF ¶ 2 (2)), and the Differing Site Condition Clause (SOF ¶ 2 (3)); gov't reply at 4-6. The CO testified in a declaration that HPA did not provide notice of the various changes. This is sufficient to shift the burden to HPA (gov't reply br. at ex. C, Jason Edge declaration at ¶¶13, 18, 21, 23, 26). *Celotex Corp.*, 477 U.S. at 323. Appellant raises several defenses but we find four relevant to the government's motion: 1) NASA waived notice requirements by considering the bases for 62038 and 62040 on the merits; 2) actual notice; 3) constructive notice; and 4) lack of prejudice on NASA's part (app. opp'n at 2-3).

### A. Did NASA's CO Waive Notice Requirements in 62038 and 62040 by Considering the Underlying REAs on the Merits?

Appellant argues in its opposition that "NASA has waived any defense it has for lack of notice because it previously considered and made partial payments on REAs [1, 4, and 10] as part of Unilateral Mod. P000044" (app. opp'n at 30; *see also id.* at 3, 31, 35-36). As support, appellant cites *Appeal of Korshoj Constr. Co.*, BCA No. 321, 1963 BCA ¶ 3,848, at 19,168, which sets forth three exceptions to strict notice and protest requirements, including when the CO "actually considered the contractor's claim on its merits without invoking the protest or notice requirement" (app. opp'n at 26). Though the *Korshoj* decision was not rendered by this Board, we have recognized and applied this exception to compliance with notice requirements. *See, e.g. Harper Dev. & Assocs.*, ASBCA No. 34719, 90-1 BCA ¶ 22,534 at 113, 085; *Precision Standard, Inc.*, ASBCA No. 54027, 03-2 BCA ¶ 32,265 at 159,600. However, appellant reads this case law much too broadly. As *Korshoj* recognizes, this exception applies when the CO fails to discuss notice requirements in the COFD, not simply when he considers any of the merits of a claim. Appellant points exclusively to Mod. No. 44 as evidence that the CO considered the claims at issue, but this modification is dated prior to appellant's claim, so cannot be relevant to the CO's consideration of its claims. (SOF ¶¶ 12-13, 27) We look instead to the CO's final decisions, where he considered the merits of the claims underlying these appeals. In the COFDs for 62038 and 62040, the CO repeatedly states HPA did not comply with proper notification procedures as outlined under the contract (SOF ¶¶ 13, 27). Thus, HPA may not avail itself of this exception to notice requirements.

18

*B. Did NASA Have Actual or Constructive Notice, and if not, was NASA Prejudiced by the Lack of Notice?*

*Actual or Constructive Notice*

We have consistently held that the notice requirements under the Changes and DSC clauses are waived if the government has actual or constructive notice of the conditions encountered. *C & L Constr. Co.*, ASBCA Nos. 22993, 23040, 81-1 BCA ¶ 14,943 at 73,962-63 (citing *Hoel Steffen Constr. v. United States*, 197 Ct. Cl. 561, 573, 456 F.2d 760, 767-68 (1927)). "The written notice requirements are not construed hypertechnically to deny legitimate contractor claims when the government was otherwise aware of the operative facts." *Parker Excavating, Inc.*, ASBCA No. 54637, 06-1 BCA ¶ 33,217 at 164,630 (citing *Grumman Aerospace Corp*, ASBCA No. 46834 *et al.*, 03-1 BCA ¶ 32,203 at 159,185) (discussing differing site conditions); *A.R. Mack Constr. Co.*, ASBCA No. 50035, 01-2 BCA ¶ 31,593 at 156,139 (discussing constructive change). Likewise, we have held that failure to comply with notification requirements in NASA Technical Direction clauses are not an absolute bar to a contractor later seeking reimbursement for additional costs. *Dan Rice Constr. Co.*, ASBCA No. 52160, 04-1 BCA ¶ 32,595 at 161,263 (discussing constructive change).[13]

Even oral notice to responsible government officials, if documented, can put the government on notice of claims. *In re SUFI Network Servs., Inc.*, ASBCA 55306, 06-2 BCA ¶ 33,444 at 165,778 (citing *A.R. Mack Constr. Co.*, 01-2 BCA ¶ 31,593 at 156,139-40). But notice must be provided "in a manner that should have put [the government official] on notice of a potential claim. Informal remarks on the job that some joints were wider than anticipated, involving additional materials, were not sufficient to alert the Government inspector, and through him the contracting officer, of a potential claim." *MGM Contracting Co.*, ASBCA No. 27839, 85-3 BCA ¶ 18,359 at 92,115. "Mere notice or knowledge that the contractor encountered a 'condition' falls short of the contractual requirement that the contractor notify the Government that it considered the condition to constitute a 'differing site condition." *Engineered Maint. Servs. v. United States*, 55 Fed. Cl. 637, 641-42 (2003) (internal citation omitted). An appellant can provide the government the required notification of the basis of a claim via RFIs, regardless of whether those documents can change the contract. *UNIT Co.*, ASBCA 60581, 18-1 BCA ¶ 36,974 at 180,113-14.

The Suspension of Work clause imposes a similar written notice requirement to that of the Changes clause (SOF ¶ 2 (4)). Like the Changes clause, this requirement has been tempered in a similar way, applying a waiver theory if the government has actual or constructive notice of a possible claim. *Decker & CO., GmbH*, ASBCA No. 35051, 88

---

[13] Although the clause in *Dan Rice Construction* is a March 1989 clause and the clause in this appeal, NFS 1852.242-70, is a later clause, September 1993, both clauses require 5 days written notice after receiving technical direction deemed a change.

BCA ¶ 20871 at 105,543; *Central Mechanical Construction*, ASBCA No. 29431, 29432, 29433, 85-2 BCA ¶ 18,061 at 90,658.

*If no Notice, was the Government Prejudiced*

Appellant's claim is not necessarily barred even if the government did not have actual or constructive notice; instead, the burden is on the government to establish that it was prejudiced by the absence of the required notice. *Leiden Corp.*, ASBCA No. 26136, 84-1 BCA ¶ 16,947 at 84,297 (citing *C.H. Leavell & Co.*, ASBCA No. 16099, 72–2 BCA ¶ 9,694, *reconsid. denied*, 73–1 BCA ¶ 9,781).

> The burden is on the Government to establish that it was prejudiced by the absence of the required notice. This burden cannot be satisfied by allegation, but must be supported by evidence in the record. . . . When the Government has knowledge of the underlying facts giving rise to a claim, it is unlikely it will be prejudiced in its investigation and defense thereof.

*SUFI Network Servs., Inc.*, ASBCA 55306, 06-2 BCA ¶ 33,444 at 165,778 (quoting *A.R. Mack Contr. Co.*, 01-2 BCA at 156,140) (internal quotations omitted). Prejudice to the government is a fact-specific inquiry, and requires more than a conclusory statement by the CO *SUFI Network Servs.*, 06-2 BCA at 165,779. We have held that lack of notice to the government can be prejudicial if it "prevent[s] any verification of appellant's claim and also the employment of alternate remedial procedures." *Schnip Bldg Co.*, ASBCA No. 21637, 78-2 BCA ¶ 13,310 at 65,103, *aff'd Schnip Bldg. Co. v. United States*, 227 Ct. Cl. 148 (1981) (internal citation omitted).

*Application to Each Appeal*

Appellant's argument in each case is somewhat limited by its repeated citation to and incorporation of its REAs, without further explanation or reference to a given page, rather than parts of the Rule 4 file. This is especially so as many of these REAs and their inclusions number in the hundreds of pages. (*See, e.g.* app. opp'n at 3, 23-24, 28-39). These often do not provide documentation for relevant allegations. Where documentation is provided, it is sometimes undated. Additionally, as this is an appeal of whether the CO's disposition of the claims, which simply reasserted and incorporated the REAs, was correct, appellant is essentially citing the REAs to prove themselves. Therefore, rather than rely exclusively on the REAs, we look to them, the documents cited within, and our own review of the Rule 4 file. Each appeal will be addressed in turn:

*1. ASBCA No. 62038*

This claim incorporates the bases for recovery advanced in appellant's REAs 1 and 4 (SOF ¶ 13; app. opp'n at 23). These two REAs, combined with the supplement submitted on July 5, 2017, seek recovery for four actions appellant undertook related to installing the WTs, which shall be addressed individually (SOF ¶ 11).

*i. Bringing the WTs into the Battleship through the North Entrance*

Appellant described in its supplement to REAs 1 and 4 its change in plans to bring the WTs into the Battleship structure via the north entrance rather than through a hole it cut in the top plate, a method discussed in Specification 200HF-G013, Section 01 11 00, paragraph 1.1.3 (SOF ¶ 5). This change also allegedly required appellant to cut the WTs into three pieces and then weld them back together once in place. Appellant was unable to go through the top plate due to the potential for the heat to warp the plate (SOF ¶ 8). The earliest document we see discussing this issue is RFI 62, dated April 29, 2014, and which the COR answered on May 1, 2014 (SOF ¶ 8). Appellant states it began the work the same day, and finished on August 11, 2014 (SOF ¶ 8). Appellant states "[a]t the time of RFI 62, HPA's subcontractors believed that the cost to cut the WTs into 3 pieces would be comparable to the cost of cutting the holes in the top plate . . . and therefore there would not no [sic] cost or schedule impact" (app. opp'n at 5 ¶ 7).

While HPA admits that it did not notify NASA of the cost or schedule impacts, it contends, in essence, that notice is irrelevant in this context because it was impossible to perform the work as designed and that the costs had to be incurred if the project were to be built (app. opp'n at 4-6, ¶¶ 4, 6-7, 9, 14). In its reply, NASA does not challenge that the work was impossible to perform. But it submits a declaration from CO Jason Edge in which he contends that NASA suffered prejudice because if he had been notified of the work beforehand, he would have "closely monitored the situation" and "would have taken definite action to control project costs" and could have ordered HPA to use less costly methods or he could even have "de-scoped the work" if he decided that HPA's costs were too high. Edge decl. at ¶¶ 16-17. While all of these assertions are plausible, NASA does not present any specific examples of work performed, or costs incurred, by HPA that were unnecessary. As a result, just as HPA's damages are unproven, so is any prejudice NASA suffered by the failure to provide notice of the alleged damages. Summary judgment is not appropriate under these circumstances.

*ii. Converting PJP Welds to CJP Welds and Use of Diamond Shape Plates*

The second basis for this appeal involves HPA's allegation that it was required to convert the PJP welds holding the WTs to the Battleship wall into CJP welds in accordance with NASA's revised answer to RFI 62, and its later substitution of a diamond shape plate as discussed in RFI 62A and its answer (SOF ¶¶ 8-9). Though generally full of conclusory statements, RCE's Vice Chairman, Craig Salabor, stated in

21

his affidavit that RCE had performed all of the affected welds between NASA's initial response to RFI 62 on May 1 and its revised response on July 31, 2014 (app. opp'n at ex. 1 at 3 ¶ 5(3)).  Appellant sent NASA a letter dated October 8, 2014, explicitly stating that NASA's revised response to RFI 62 constituted a constructive change (SOF ¶ 9).  This constitutes actual notice; moreover, we believe NASA should have been aware of a potential claim from its two responses to RFI 62 and the length of time between them relative to the amount of work they affected.[14]  Subsequent communications in RFI 62A merely continue the discussion.

### iii.  Welding and Trimming the WTs to Fit Flush with the Walls

Once the WTs were brought into the Battleship, Quality Iron, through appellant, alleges that they could not be made flush with the wall, as the contract required, because the wall was not straight, and thus making them fit required extra work.  The first instance of a dated, documented discussion of this issue between the parties which appellant's REA cites is NASA's approval of RFI-140, dated August 6, 2014 (SOF ¶ 10).  This undated RFI proposes work to fix the problem "of the web plate of the battleship [which] is warped and uneven."  (SOF ¶ 10)  We believe NASA at least should have been aware of the basis for a claim from this exchange, which appears to have taken place prior to performing the proposed work.

### iv. Relocation of the WTs

Appellant is also claiming compensation for "NASA issu[ing] a design change moving the location of the WT's" when "some of the WT's had already been installed" citing only its REA 1 (app. opp'n at 7 ¶ 17).  This document references FCR 6, Transmittal 13, and RFI 54 (SOF ¶¶ 6-7) as discussing this work.  A revision of FCR 6 does contain a document in which HPA states "RFI 040 did not impact Quality Iron's cost or schedule for EMI's 18 & 20," though it's unclear if this is referring to different work than the WT relocation (SOF ¶ 7).  Transmittal 13, sent by NASA, approves several drawings, apparently submitted by HPA, but which we are unable to find in the Rule 4 file, and states another five will be revised (SOF ¶ 6).  NASA provides three of these drawings in RFI 54, but does not appear to discuss the relocation of WTs in the RFI's text (SOF ¶ 6).  The drawings are also at too low a resolution to make out much of the text which was added or changed.  The next earliest document which should have put NASA on notice of the basis of the claim is the first provided revision of FCR 6, dated August 1, 2014, which discusses removing previously installed WTs and installing them in new locations as a "change to ongoing work."  The revision to FCR 6 does indicate that the

---

[14] Appellant's opposition cites Mr. Salabor's affidavit for the proposition that this work was to take 5 days but ultimately took 102.  However, the affidavit does not state this.  (*Compare* app. opp'n at 5 ¶ 4 *with* ex. 1)  Regardless, it suffices for our purposes to know that the work was completed at least to some significant degree by the time the revision was issued.

parties had already discussed whether this would increase contract cost. (SOF ¶ 7) We do not believe NASA can say it was unaware of the basis of a potential claim. At a minimum, this indicates the existence of a genuine issue of material fact.

Therefore, appellant may continue to pursue its Change and DSC theories under 62038, and the government's request for summary judgment as to these theories under this appeal is denied.

*1. ASBCA No. 62039*

This claim incorporates the bases for recovery advanced in appellant's REA 9 (SOF ¶ 27; app. opp'n at 32). The timeline for the initial phase of this work was September and late October 2014 (SOF ¶ 15), though correcting the work occurred around March 2015 (SOF ¶¶ 20-22).

Appellant points to RFIs 146 and 146A as its earliest documents putting NASA on notice of the work at issue being incongruent with the contractually described work (app. opp'n at 8 ¶ 20, app. opp'n at 32). These were dated August 14 and 13, 2014, respectively (SOF ¶¶ 16-17). RFI 146 observes an issue, and requests NASA "[p]lease advise how to proceed" (SOF ¶ 17). In our view, the content of RFI 146 is not sufficient to put NASA on notice of the work for which appellant is seeking compensation. Appellant's argument that it does so is undercut by appellant in its cross-motion for partial summary judgment, when it states "the only change expressly included [in RFI 146] was to omit the UT" (app. opp'n at 10 ¶ 29). We agree with this latter argument in appellant's motion. The RFI states "[e]xisting conditions, in the form of welds on W14 columns for MPTA, prevent the 2-1/2" thick plates from achieving proper CJP weld. . . . Please advise how to proceed." NASA's sketches, though they add information, appear to clarify the drawings on Sheet S-505. This is clarifying a different method of achieving the same results which are required under Drawing S-505.

In RFI 146A, HPA requests a change to the testing of work, not the actual work itself. NASA accepted the proposed method of accomplishing the work and requested appellant to submit FCR 34 to capture the change in work. (SOF ¶ 16) Appellant did so, but only included the omission of UT testing and an attendant credit to NASA, which was incorporated into the contract via Mod. No. 2 (SOF ¶¶ 16, 18).

Appellant states it was not aware of the extra work until much later than RFI 146 (app. opp'n at 10-11 ¶¶ 30, 32-33, 37-39), when it conducted its investigation for the slugged welds. It is unclear, then, why appellant believes NASA should have been aware of the extra work to be performed from either RFI 146 or RFI 146A. These RFIs are insufficient to have put NASA on notice of the basis of this claim.

Aside from these two RFIs and NASA's answers to them, the work at issue is next discussed in REA 9, dated July 15, 2017 (SOF ¶ 24). HPA also points to REA 10, dated

23

the same day, as evidence that it provided constructive notice to NASA. However, it does not specifically state what part of REA 10 indicates an earlier document which put NASA on notice of the work at issue in 62039, and we are unable to find any (e.g. app. opp'n at 13 ¶¶ 51-52). For purposes of proving notice, the significance HPA places on REAs submitted long after the completion of the work is not clear.

This documentation must be weighed against other contemporaneous documentation which appellant was submitting to NASA at the same time. Between the RFIs and REA 9 was NCR 11, which HPA sent to Quality Iron, dated March 9, 2015, for poor quality welds with no specification as to which welds, and HPA's March 10, 2015 letter, in which HPA stated it would hold QI responsible "if the [slugging] allegation is found to be true" (SOF ¶ 29). Quality Iron's Corrective Action Plan, submitted 10 days later, stated it would repair the issue at no cost to NASA. (SOF ¶ 29) This reflects HPA's original Quality Assurance Plan, in which it stated it would repair unacceptable welds immediately at no additional cost to the government, as well as the government's specification regarding unacceptable welds (SOF ¶ 4). All of these indicate HPA viewed QI as on the hook for bad quality welds. We do not find NASA had constructive notice of a potential claim related to this work.

In his Declaration, the CO states that HPA "did <u>not</u> promptly notify me in writing of the alleged Differing Site Condition before conditions were disturbed" (gov't reply ex. C at 11 ¶ 18) (emphasis in original). However, this statement does not illuminate whether the government will be prevented from effectively defending itself against the allegations in this claim due to such disturbance. The rest of the Declaration reiterates the generalized statements discussed in 62038 above, and where particularized to this claim, focuses conclusory statements on not having received notification in accordance with the provisions of the contract, essentially reiterating the arguments in the motion (*see e.g. id.* at 11-14 ¶¶ 18-20).

HPA has not provided the Board with any evidence that it provided NASA with timely notice. However, there is a material fact with respect to any prejudice that NASA suffered as a result of the lack of notice. Thus, we deny the government's motion for summary judgment as to appeal ASBCA No. 62039.

### 2. ASBCA No. 62040

Appellant admits it did not provide notice to the CO prior to incurring the claimed costs in this appeal (app opp'n at 17 ¶¶ 69-70). In its consolidated complaint, appellant advanced several theories to support this claim, however, most need not be addressed here. As noted above, breach of the implied duty of good faith and fair dealing and the Inspection of Construction clauses are not subject to the notice requirements at issue in this motion. The Changes clause provided the basis for appellant's argument as to defective specifications (app. opp'n at 28 ¶ (4)). Although this clause does have a notice requirement, it specifically excludes claims for defective specifications (SOF ¶ 2 (3)).

24

Since there is no notice requirement associated with this appeal, we deny summary judgement of ASBCA No. 62040.

### 3. ASBCA No. 62041

Several problems with appellant's argument obfuscate whether NASA had constructive notice of this claim. Appellant alleges it "did not learn of the ksi [(the tensile strength)] of the Battleship steel until February 22, 2016," pointing to REA 11, which it also incorporates into its argument (app. opp'n at 36). However, REA 11 does not appear to support that contention. This date is only in REA 11 as the calibration date of the Digital Hardness Tester, with which appellant "performed random field tests" of the MPTA and Battleship. The only other date appellant gives for realizing the allegedly differing ksi of the steel is given as "2016." No evidence is presented in the REA for the test results except a picture of the tester, presumably in use.

To support the steel hardness which the contract allegedly represented, REA 11 includes drawing G-001, but HPA does not specify which of the three contractual Drawings numbered G-001 it is, and it is unreadable anyway. The reproduction does bear a resemblance to EMI 19, Drawing G-001 provided under tab 5. (SOF ¶ 33) However, HPA states in the REA "[t]he contract drawings specifically state to use a 70ksi filler material," but the drawing does not state this either. REA 11 also indicates NCR 11, dated March 9, 2015, provided the NASA directive which required pre- and post-heat treatment on new-to-new structural steel full penetration welds. The NCR 11 provided in the Rule 4 document was actually issued by HPA, not NASA (SOF ¶ 29).

Appellant also states "NASA did not disclose this critical knowledge [of the hardness of the steel at issue] to bidders on this project. Finally . . . at least two (2) workers with years of Stennis Space Center experience told [RCE] that a blanketed pre-and post-heat treatment would be necessary" (app. opp'n at 37). One of the cited sources states "[t]his sharing of NASA's superior knowledge was communicated by Chuck Stewart . . . and by the office mate of Carl Flettrich ([an employee of NASA's subcontractor]) who was a NASA employee during this project but whose name I cannot recall at this time." (App. opp'n at ex. 3, aff. of J. Phillips ¶ 12; *see also* ex. 4, app. answers to respondents interrogatories at 22, answer to interrogatory No. 29, giving virtually the same answer) With respect to the former: we can discern from the record before us that Mr. Stewart was an employee of HPA during the performance of this contract, and not NASA, seemingly indicating internal communication problems at HPA, rather than NASA's withholding of superior knowledge (SOF ¶ 4). As to the latter: the record does not appear to indicate when this "verbal admission" was given, nor to whom, nor the identity of Mr. Flettrich's office mate. At best, these all represent questions of genuine issues of material fact.

We do know, however, that some of the work had been performed by March 9, 2015, as we do have a Corrective Action Report from RCE stating the work at issue would

be fixed at no extra cost (SOF ¶ 29). We also have before us a report, dated April 5, 2016, from a testing firm not party to this contract analyzing the composition of the steel, and suggesting it is consistent with 1018 Carbon Steel (SOF ¶ 30). Another document which appellant has included in its Rule 4 supplement, though neither party discusses it, is RFI 371, dated April 27, 2016. In this document, HPA informed NASA its "subcontractor has evaluated the pre-existing structural steel on the stand . . . and has identified an unusually high yield stress of the existing steel structure" and if "the findings from the subcontractor prove to be accurate that further investigation is warranted . . . and could result in weld failure." The NASA COR reply, dated May 6, 2016, states "[t]he additional information and suggestions will be taken into advisement" (SOF ¶ 31). This RFI and its response appear to indicate NASA had constructive notice of the difference in hardness and a potential claim arising from it at least as of this date.

As regards prejudice in this appeal, the CO has stated that if he had had proper notice,

> I would have discussed the issue at great lengths with HPA and tried to determine if NASA was at fault. If NASA was at fault, we would have processed a FCR. . . . If I determined NASA was not at fault, I would have issued HPA a letter informing them of their contractual responsibilities to perform the work.

(Gov't reply at ex. C ¶ 25) The CO further discusses escalating to termination if HPA did not comply (*id.*). Unfortunately for the government, this and the generalized statements discussed above in 62038 are not the type of proof of prejudice to defense of the claim in the current appeal that we require. Prejudice to the government can be shown "by demonstrating either that it might have minimized extra costs if proper notice had been given, or the passage of time obscured the elements of proof." *Ace Constructors, Inc. v. U.S.*, 70 Fed. Cl. 253, 272 (Fed. Cl. 2006) (internal citations omitted). At best, numerous genuine issues of material fact remain. The government's motion for summary judgment as to appeal ASBCA No. 62041 is denied.

*4. ASBCA No. 62042*

Appellant argues that the contract documents stated "to expect up to 1/8 inch per 100 feet per 15º F of movement in the structure. In the field, the structure moved 2 and 3/16 inches by survey and 2 1/4 inches by tape" (app. opp'n at 37-38 (citing ex. 3, aff. of J. Phillips ¶ 13)). This argument cites only to REA 12 and Mr. Philips's affidavit for support (app. opp'n at 37-39). Mr. Philips's affidavit is cited for the allowance of movement in the contract, the movement which appellant alleges is outside that allowance, and that Quality Iron and RCE were "talking with NASA representatives continuously as they encountered significant movement problems" (app. opp'n at 39 (citing ex. 3, aff. of J. Phillips ¶ 13)). The affidavit does not discuss movement

tolerances beyond the same conclusory allegation in the opposition, which we cannot accept as evidence. From the information before us, we cannot determine whether the movement appellant alleged it observed is even outside the tolerance appellant alleges is incorporated in the contract.

For evidence of communications with NASA, this affidavit points to REA 12 Attachment 3, "Quality Iron/HPA/NASA emails, correspondence and RFIS – June – September 2015" (app. opp'n at ex. 3, aff. of J. Phillips ¶ 6(c)). REA 12, attachment 3 is an email chain between June 12, 2015, and September 22, 2015, which concerns RFIs 292 and 292A (SOF ¶ 38; app. supp. R4, tab 43b(c)). The rest of this document appears to be a purely internal discussion between HPA and its subcontractors regarding these two RFIs, which do not help appellant prove that it informed NASA of the movement it alleges. The RFIs do not provide notice as to a potential claim, as RFI 292 explicitly states "[t]his recommendation is proposed at no additional cost to NASA" and we do not read RFI 292A to reverse this assertion. (SOF ¶ 36) Our review of the record did not reveal any other communications between June and September 2015 which address this issue.

REA 12 alleges "RCE also on May 11, 2015 issued RFI 275 to get clearance issues resolved on the removal platform" and provides a reproduction of this RFI. This reproduction, if we were to accept it as valid, does address "thermal expansion & contraction" but does not appear to suggest this is outside any contractual tolerances (SOF ¶¶ 37-38). The REA also alleges "that work which should have required only days to complete actually took months because of the moving structure as constantly noted on reports, RFI's[sic], emails and other forms of communication. The below are excerpts from many of those complaints" but the documents provided are all re-typed reproductions of emails, notes, reports, and RFIs between March 23, 2015 and May 6, 2016. (SOF ¶¶ 37-38) NASA only appears to be implicated by the RFI reproductions, as the rest are also internal to HPA and its subcontractors. HPA and one of its subcontractors also appear to have been debating this issue as late as May 16, 2016, seemingly indicating it was skeptical of the thermal expansion issue at this point (gov't amend. mot. at ex. A at 1).

While we do not take these reproduced RFIs as valid, were we to take them at face value, four more would be salient. The reproduction of RFI 315 states it was "generated to bring the issue to NASA's attention" while suggesting to either "leave as is or" perform specified work, though it does not specify if, in the view of the submitter, this work is extra-contractual. The reproduction of RFI 113 also mentions this work and does explicitly state there will be a schedule and cost impact. However, the reproduction of RFI 76.1, which also appears to discuss this work, states "[t]his recommendation is proposed at no additional cost to NASA," as does the reproduction of RFI 85. None of these documents appear to be in the Rule 4 file. These reproductions lack a signature and evidence of what date they were submitted or answered, and by whom, and whether the Prior Approval Note Text was included in accordance with the government's practice. (SOF ¶¶ 38, 40-43)

27

Finally, appellant alleges "Quality Iron did provide notice to NASA via conversations on the construction site and/or other informal methods" but provides no further details, citations, or documentation (app. opp'n at 21 ¶ 100). The REA also points to a "survey dated 5/6/2016 [which] was submitted to NASA with a request for verification." This document does not appear to be provided in the Rule 4 file, and appellant does not locate it. Appellant has not met its burden showing it provided constructive notice to NASA with regard to this appeal.

The government makes a more concrete showing of prejudice here, alleging that the conditions were disturbed long before it received notice of the DSC (gov't amend. mot. at 17; gov't reply at 38). However, it does not take the final step and explain how this disturbed condition bears on its defense of the claim, nor do the facts themselves so indicate. Similarly, the CO also stops short of saying how the condition is disturbed, only that he would "likely change the requirement to a more affordable method, or delete the work, therefore requiring a possible credit." (Gov't reply at ex. C ¶ 12) No method is identified, nor is there an indication how the project would suffer or benefit from the work which would have been "deleted." The government's filings do not add to this.

Several genuine issues of material fact remain, which precludes our grant of summary judgment in ASBCA No. 62042.

### III. The Government's Affirmative Defense of Accord and Satisfaction and Appellant's Cross-Motion

The second basis for the government's motion is based on the affirmative defense of Accord and Satisfaction as it relates to 62040[15]. The government argues the work discussed in RFIs 146 and 146A was added into FCR 34, which was then incorporated into the contract by Mod. No. 2. "The modification contained a release of future claims for equitable adjustment." (Gov't resp. at 3) Thus, the release language in Mod. No. 2 must cover the work discussed in RFIs 146 and 146A. Appellant filed a cross-motion for partial summary judgment in order to strike this defense from the government's answer to 62039 and 62040, arguing that there was no meeting of the minds as to settlement of all claims related to RFI 146 and 146A and no consideration for the work in those appeals (app. mot. at 6-7; app. reply at 1, 3).

---

[15] The motion states this defense is in "regard to the Third Claim for Relief ("REA 10") . . . (this claim has already been settled)" (gov't mot. at 1). Similarly, appellant's cross-motion discusses "settle[ment of] the claims at issue in HPA's REAs 9 and 10" (app. mot. at 1). As the substance of the parties' arguments relates to the claims in 62039 and 62040, and these claims incorporate these REAs, we understand these arguments relate to the claims and denials in those appeals, rather than the REAs which both parties repeatedly cite, over which we would not have jurisdiction. 41 U.S.C. § 7104.

28

Mod. No. 2 releases NASA "from any & all liability under this contract for further equitable adjustments attributable to *the above change*" (SOF ¶ 18) (emphasis added). The only discussion of change in work as relates to Mod. No. 2, or FCR 34 for that matter, is omitting the UT testing. This release language does not affect the discussion of work in RFIs 146 and 146A, regardless of whether that work is contained in the contract (*id*.). The government's arguments defending against appellant's cross-motion are unavailing (gov't resp. at 3). We find this defense inapplicable to the claims at issue in 62039 and 62040. Thus, the government's motion for summary judgment must be denied on this basis as well, and the appellant's cross-motion for partial summary judgment must be granted.

<u>CONCLUSION</u>

For the reasons stated above, the government's motion is denied in its entirety. The appellant's cross-motion is granted.

Dated: December 10, 2020

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

29

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62038, 62039, 62040, 62041, 62042, Appeals of Harry Pepper and Associates, Inc., rendered in conformance with the Board's Charter.

Dated:  December 10, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals